## Commonwealth ex rel. D'Ercole v. Barnes et ux.

*Frank O. Moretti*, for relator.

*Gilbert D. Levine* and *Howard W. Lyon*, for defendants.

BRAHAM, P. J., August 14, 1953.—On June 2, 1953, this court issued a writ of habeas corpus upon the relation of Helen D'Ercole against John Barnes and Betty Barnes, his wife, to determine their right to custody of Dolores Ann D'Ercole, minor child of plaintiff. The writ was served the same day but hearing was not had on June 4th, the day fixed, but by agreement the case was heard on August 10th. In the meantime, on July 8, 1953, plaintiff took the child from defendants without their consent. On August 10th at the hearing her counsel filed a written motion to discontinue the action and an oral motion to be allowed to withdraw as plaintiff's attorney. Both motions were

refused. Upon instructions of his client plaintiff's lawyer withdrew from further participation in the hearing. The child was not present at the hearing.

From the evidence we make the following findings of fact:

1. The child whose custody is here in suit was born February 20, 1952, in the Trumbull County Hospital, Warren, Trumbull County, Ohio, the child of Helen D'Ercole, an unmarried person, and Earl D'Angelis, a married man and the father of a number of children. Helen D'Ercole and Earl D'Angelis had been living together and posing as man and wife under the names of Mr. and Mrs. James Mains and the name furnished for the birth certificate of the child was Dolores Mains. Helen D'Ercole is now aged about 20 years.

2. The child was unwanted. Attempts were made to do away with the child before birth. Immediately upon the birth Helen D'Ercole commissioned Mrs. Ruth Ungar to find a home for the child.

3. Defendants are husband and wife who live in New Bedford, Lawrence County, Pa. They have been married about seven years but have no children. Lacking a child of their own they were extremely desirous of having one for adoption.

4. Defendants learned from a doctor in Youngstown of the child which Helen D'Ercole was expecting to bear and arranged through Ruth Ungar to take custody after the birth. They planned to adopt the child.

5. When Helen D'Ercole left the hospital in Warren, Ohio, after the birth of the child she was accompanied by Earl D'Angelis. She then delivered the child, known now as Dolores D'Ercole to the custody of defendants with the idea that defendants would adopt her. At the same time Helen D'Ercole signed a consent to the adoption of her child but the consent was signed in blank. She also delivered a few personal effects with the child.

6. It was the purpose of Helen D'Ercole when she delivered up her child utterly to abandon the child and to get rid of her obligation as parent.

7. At some time during the progress of the arrangements for getting the child defendants paid to Ruth Ungar the sum of $200. This was stated by Mrs. Ungar, and was believed by defendants, to be for the purpose of paying the laying-in expenses of the baby. After receipt of the money Mrs. Ungar, being in straightened circumstances, did not pay the hospital bill but appropriated the money for herself.

8. After delivering up possession of her child Helen D'Ercole continued to live in adultery with Earl D'Angelis. She also continued immoral relations with other men. Her relations with D'Angelis and others have continued until after the time she brought the present action.

9. After they received the baby defendants consulted a lawyer from Youngstown, Ohio, about adopting her and were advised they would have to wait a year. They were not informed and did not know of any other requirements of the State of Ohio with respect to adoption and believed they were complying in all respects with the law.

10. Defendants have kept and maintained the child in their home at New Bedford at their own expense since they received her in February 1952. They have given the child the best of care and training.

11. Defendants are excellent foster parents. They are young and healthy, have good education, are members of the St. John's Episcopal Church of Youngstown, Ohio, enjoy the esteem of the entire community where they live, and have a good commodious house in which to rear the baby. John Barnes is a salesman employed in Youngstown, Ohio, and earns an ample amount to enable him to support the child. Defendants have become very much attached to the child.

12. On June 2, 1953, Helen D'Ercole brought habeas corpus in this court in the attempt to recover custody of her child. The writ was duly served on defendants but plaintiff did not elect to come to trial at once.

13. While the case was pending, to wit, on July 8, 1953, plaintiff, Helen D'Ercole, came and took the child from defendants without their consent. She took her to the place in Warren County where she was living in adultery with Earl D'Angelis. At the time of the taking Helen D'Ercole was domiciled in the State of Ohio, but the child had been living in Pennsylvania for about 18 months. Plaintiff was still domiciled in Ohio when she brought this suit.

14. Defendant, John Barnes, gave chase, located Helen D'Ercole and Earl D'Angelis, saw them apprehended and taken to jail and was given the opportunity of taking the child back with him. He was advised, however, that the court would hold a hearing to determine custody and left the child with the authorities.

15. Plaintiff, Helen D'Ercole, mother of the child, is not a fit and proper person to have custody of the child and the welfare of the child will not be served by allowing her to have custody.

16. Defendants, John and Betty Barnes, are fit and proper persons to have custody of the child and the child's welfare will be served by leaving her with them.

Since this case involves a dispute between plaintiff domiciled in Ohio and defendants domiciled in Pennsylvania, it is well to consider two features in which the law in Pennsylvania may differ from the laws of Ohio. In the first place habeas corpus is with us the appropriate remedy to try the right to custody of a child: Commonwealth ex rel. Children's Aid Society, Guardian, v. Gard et ux., 362 Pa. 85; Commonwealth ex rel. Bosco v. Olson, 173 Pa. Superior Ct. 319; 11 Standard Pa. Practice 119, §61. Next, discontinuance

is the only way by which a plaintiff may withdraw his suit before trial (Pa. R. C. P. 229) and an action in which a minor is a party may not be compromised, settled or discontinued except after approval of the court: Pa. R. C. P. 2039 (a). Discontinuance of a suit may, on general principles, be had only with leave of court: Schuylkill Bank v. Macalester, 6 W. & S. 147; Consolidated National Bank v. McManus, 217 Pa. 190; 5 Standard Pa. Practice 9, §6.

In the case at bar defendants, who are domiciled in Pennsylvania, have in good faith for a year and a half undertaken to rear plaintiff's child. They have responded when plaintiff (who for some reason has changed her mind) came into this court to recover her child. To allow plaintiff, after she had lulled defendants into security by coming to court, to take the law into her own hands and remove the child by force will not do. It is inequitable and therefore the court in its discretion will not allow it: Shapiro v. Philadelphia et al., 306 Pa. 216.

The main problem before us is, of course, whether the law of the domicile of the illegitimate child's mother, Ohio, or the law of the forum where the child is located shall prevail. Under Pennsylvania law the welfare of the child is the primary consideration: Commonwealth ex rel Children's Aid Society v. Gard et ux., 362 Pa. 85; Commonwealth ex rel. Graham v. Graham, 367 Pa. 553; Commonwealth ex rel. Shelton v. Bush et ux., 152 Pa. Superior Ct. 580. The mother is ordinarily entitled to the custody of a small child but not if she is an unfit person: Commonwealth ex rel. Bosco v. Olson, 173 Pa. Superior Ct. 319; Commonwealth ex rel. Burke v. Birch, 169 Pa. Superior Ct. 537; Commonwealth ex rel. Lewis v. Tracy et ux., 155 Pa. Superior Ct. 257.

It is our duty under the Uniform Foreign Law Evidence Act of May 4, 1939, P. L. 42, 28 PS §291 et seq.,

to take cognizance of the law of Ohio. By Section 1352-13 of the Ohio Code (Page's Ohio General Code Annotated, page 356) it is provided that:

"No child under two years of age shall be given into the temporary or permanent custody of any person, association or institution which is not certified by the division of charities, department of welfare, as provided in sections 1352-1 and 1356-6 of the General Code, without the written consent of the division of charities or by a commitment of a juvenile court."

Section 12789-1 of the code (10 Page's Code 248) makes it a criminal offense to violate section 1352-13 and establishes a penalty. Section 8004-8 of the Ohio Code Supplement (5 Page's Code Supplement 102) provides that if the Ohio probate court finds that a child sought to be adopted was placed in a home in violation of the laws relating to placement it shall certify the case to the juvenile court which, after hearing, shall determine whether the placement is for the best interest of the child, shall approve or disapprove the placement, and shall certify its findings to the probate court.

In short, the difference between the law of the two States is that in Pennsylvania the custody of children placed for adoption is a matter for the direct decision of the court in the first instance, whereas in Ohio placement for adoption is by agencies approved by the government, subject to control by the courts.

Which law governs? Here we are on one of the ancient battlefields of the law where controversy is still going on. There are States which hold that jurisdiction to determine the custody of minor children is exclusively in the State of the child's domicil. As applied to an illegitimate child this means the domicil of the child's mother. This is the view adopted by the A. L. I. Restatement of the Law of Conflicts of Laws, §117, which provides:

"A state can exercise through its courts jurisdiction to determine the custody of children or to create the status of guardian of the person only if the domicil of the person placed under custody or guardianship is within the state."

There are States which hold that the presence of the child within the jurisdiction is sufficient to give the courts jurisdiction to determne the right to custody: 39 Am. Jur. 605, Parents & Child, §18. Excellent annotations of the question are found in 4 A. L. R. 2nd 7 and 9 A. L. R. 2nd 434.

The extreme view advocated by the restatement which gives jurisdiction exclusively to the courts of the domicil is demonstrably insufficient to cover the situations which arise. Let us assume, for example, that one of defendants' good neighbors at New Bedford, noticing the child in defendants' home and becoming attracted to her, took the child from defendants and kept her so that defendants were obliged to come to court for redress. Would anyone contend that the court of this county would be obliged to send the parties to Ohio, the place of domicil, for a decision? Let us assume again that the child was in defendants' possession after full compliance with the Ohio law as to placement and that the mother came to our courts to try to get the child back. Would anyone contend that this court was powerless to hear the parties? Two variants appear in the present case, the failure to comply with the Ohio law and the forcible removal of the child from this jurisdiction after suit was brought. They will be discussed later.

On principal we agree with the law as stated by Mr. Justice Cardozo in Finlay v. Finlay, 240 N. Y. 429, 148 N. E. 624, 40 A. L. R. 937, as follows:

"The jursdiction of a State to regulate the custody of infants found within its territory does not depend upon the domicile of the parents. It has its origin in

the protection that is due to the incompetent or helpless (citation omitted). For this, the residence of the child suffices though the domicile be elsewhere (citation omitted); but the limits of the jurisdiction are suggested by its origin. The residence of the child may not be used as a pretense for the adjudication of the status of parents whose domicile is elsewhere, nor for the definition of parental rights dependent upon status (citation omitted)."

The adjudicated cases in this State support the view that the presence of the child here is sufficient to give the court jurisdiction. In Commonwealth ex rel. Graham v. Graham, 367 Pa. 553, 560, the law is summarized by Mr. Justice Chidsey as follows: "Residence within this Commonwealth is sufficient for exercise of jurisdiction by our courts: Com. ex rel. v. Daven et al., supra [298 Pa. 416]; Com. ex rel. Sage v. Sage, supra [160 Pa. 399]; Com. ex rel. Camp v. Camp, supra [150 Pa. Super. Ct. 649]; Com ex rel. v. Eich, supra [73 Pa. Super. Ct. 268]; in Re Custody of Minor Children of Dunbar A. Rosenthal, supra [103 Pa. Super. Ct. 27]."

Our courts may not relieve themselves of the duty of deciding questions regarding the custody of children who are in the care of Pennsylvania citizens by requiring them to go elsewhere to litigate the matter: Commonwealth ex rel. Sage v. Sage, 160 Pa. 399. The general view supports jurisdiction where the child is: 4 A. L. R. 2nd 7, 16; A. L. I. Restatement of the Law of Conflict of Laws, §148.

In the case at bar plaintiff mother consented to the jurisdiction of the Pennsylvania courts. As appears from the cases cited, the Pennsylvania courts have undoubted jurisdiction of the subject matter of the dispute. Plaintiff has given consent to jurisdiction over her person: Commonwealth ex rel. Camp v. Camp, 150 Pa. Superior Ct. 649.

Next we must consider defendants' conduct in failing to comply with the Ohio statute regarding the placement of children for adoption. Here it will be noted that the Ohio statutes do not declare void all placements made contrary to the method provided by law; they merely make such conduct a criminal offense and prescribe a penalty. It is reserved to the court to determine whether the illegal placement may not after all be a good one. If the arrangement is a good one the child is left where it is, the law apparently recognizing how bad it is for small children to be pulled about from place to place and quarreled about in public. What the Ohio court may do by way of approving a placement which is favorable to the child and which has been consummated this court may do. Conflict between theories and the clash of warring factions should not be allowed to disturb the peace and security of the child. Even where a child has been abducted into the State of the forum the courts have jurisdiction: 4 A. L. R. 2nd 1, 22.

The taking of the child out of this jurisdiction by plaintiff after the institution of her suit does not affect the result. She might be proceeded against for contempt of court but jurisdiction having been properly invoked continues. Plaintiff's conduct in removing her child throws light on her fitness to have custody: Commonwealth ex rel. Lewis v. Tracy et ux., 155 Pa. Superior Ct. 257.

Our finding that defendants are fit persons to have the child is amply borne out by the evidence. Defendants had a large number of their neighbors who came to testify for them who were not heard because the court was satisfied on the point. The evidence also amply justifies the conclusion that plaintiff is an unfit person to have custody. She had persisted living in adultery with a married man, while conducting amours

with other men, almost to the time of trial. The similarity between this case and the cases of Bosco v. Olson, Burke v. Birch, and Lewis v. Tracy, cited above, will at once be observed. No claimant for custody of the child other than plaintiff has appeared to claim her. There is no real showing of a difference in religion and even if there were a difference this is with us important, but not controlling: Commonwealth ex rel. Burke v. Birch, 169 Pa. Superior Ct. 537, 543. There was talk of claim by some charitable organization of Ohio but such organizations ordinarily do not themselves want the child; the child is desired only to approve this or some other placement. It is hoped that the placement with Mr. and Mrs. Barnes will be seen as one proper for the child in every way and that it will be approved by the Ohio welfare people and the Ohio courts alike.

Decrees for the custody of children once properly made are entitled to full faith and credit under the Federal Constitution: 39 Am. Jur. 614, §25; In re Zoell's Estate, 345 Pa. 413; Commonwealth ex rel. Teitelbaum v. Teitelbaum, 160 Pa. Superior Ct. 286. Nevertheless the power to make such new order as may be required by changed circumstances undoubtedly exist as appears from certain of our own cases: Commonwealth ex rel. v. Daven et al., 298 Pa. 416. A like power cannot be denied the Ohio courts. Nevertheless, it is to be hoped that, if this matter comes before the Ohio courts for decision, the case will be seen not as one of baby snatching by unscrupulous persons but as an honest effort of very worthy young people to obtain a child to rear. They had no intent to violate the Ohio law and showed their good faith by leaving the child in Ohio when, after recovering the child, they left her in Ohio to await action by the courts.

Entertaining these views we make the following

## Order of Court

Now, August 14, 1953, after hearing and full consideration of this case the custody of the minor child, Dolores Ann D'Ercole, is awarded to defendants, John Barnes and Betty Barnes, his wife. The costs are placed upon plaintiff.