# Commonwealth ex rel. Children's Aid Society, Guardian, Appellant, *v.* Gard et ux.

Argued March 23, 1949. Before Maxey, C. J., Drew, Linn, Stern, Patterson and Stearne, JJ.

*Samuel G. Wagner,* with him *Carl E. Glock* and *William I. King,* for appellant.

*Thomas E. Whitten,* with him *Jason Richardson,* for appellees.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 23, 1949:

In habeas corpus proceedings the Court of Common Pleas of Allegheny County awarded custody of a female child, Betty Jean Tuttle, to the Children's Aid Society of that county. On appeal, the Superior Court reversed the judgment and awarded the child to Mr. and Mrs. W. Russell Gard, who have had custody of the child since June 28, 1945.

The child was born out of wedlock on January 19, 1944. Her mother, being unable to care for her, placed her in the Rosalia Foundling Asylum in Pittsburgh where she remained until May, 1945, at which time the Society requested the mother to remove the child because of its age. The mother then sought the assistance of the Children's Aid Society to arrange for the child's care. In May, 1945, Mr. and Mrs. Gard answered the appeal of the Children's Aid Society for foster homes for children then in the Society's custody. Mr. and Mrs. Gard sought to file an application for the adoption of a child but the Society discouraged it because of the large number of such applications they had already received. The Society's agent informed the Gards that there was need of "foster homes" for children. Being willing to provide such a home, the Gards on May 23, 1945, signed a "boarding home contract" in which they agreed "to accept any child so placed with us subject to the conditions laid down by the Society which we recognize has custody. We agree to hold any such child subject at all times to the call of the Society." It was also provided that the Gards should be paid for "board, clothing, medical care," etc., for the child. They declared therein that

they understood that "any child entrusted" to them was not "for placement and adoption", and they covenanted "not to do any act or thing with a view toward adoption."

On June 28, 1945, the child was taken to the Gard home and she has been there from that date to the present time. In August, 1945, the child's mother advised the Society that she had an opportunity to marry and she asked the Society to arrange to have the child adopted by suitable persons. On December 20, 1945, Mr. and Mrs. Gard expressed to the Society their desire to adopt the child. On June 28, 1946, the mother executed a formal release of her claim to her child and granted authority to the Society to arrange for the child's adoption. Three days before this, the Society advised the Gards, without stating any reason therefor, that the Society desired the return of the child. Appellees refused the demand. On June 28, 1946, without notice to the Gards, the Orphans' Court appointed the Society as Guardian of the child. On July 2, 1946, the Society filed with the Orphans' Court its petition for the child's custody. On July 29, 1946, the Orphans' Court directed the Gards to deliver possession of the Child to the Society. Upon appeal to the Supreme Court it was held that the Orphans' Court was without jurisdiction to decide the question of the custody of the child and that the parties seeking possession must proceed by writ of habeas corpus in the Court of Common Pleas.

On July 8, 1947, the Society filed its application for writ of habeas corpus averring, inter alia, its appointment as guardian by the Orphans' Court of Allegheny County, that custody of the child by it was necessary ". . . in order to perform the duties of its appointment", that "appellants presently have custody by virtue of the agreement referred to but have, after demand, refused to surrender the child", that "the Society pursuant to the wishes of the natural mother, has arranged for a permanent placement and selected an appropriate adoptive

home", that "the immediate and permanent welfare of the infant requires that it should be in the custody of the Society", and that "it should be restored to the possession of the Society to be dealt with in accordance with the relator's duty to the Court of its appointment." On July 23, 1947, the mother of the child joined with the Society and refused to consent to the adoption of the child by Mr. and Mrs. Gard.

The Gards admitted the existence of the Agreement of May 23, 1945, and the receipt of the sum of $801.31 for the maintenance and support of the child. They averred that on May 12, 1947, they made a tender to the Society of all the money received by them for the care of the child, which tender was refused. They also averred that the Agreement was ineffective as "against public policy" and that "the best interests of Betty Jean Tuttle are best served by her remaining with the respondents". They denied that the Society had a permanent placement selected for the child in accordance with the desires of the natural parent, and demanded proof thereof. They declared that information concerning this matter "has been consistently denied to the respondents by the petitioners" and that they "have become attached to said child during the two years[1] of their possession, and that they desire to raise and adopt this child as their own and being reputable citizens of the community assert that the best interests of the child will be served by remaining with them and in their custody." They stated that, "For in excess of two years[1] they have lavished their affection upon her and maintained her in a proper style and atmosphere. The respondents own their own home in Crescent Hills, Penn Township, Allegheny County, Pennsylvania, and that community is ideal for the rearing of children. They are financially able to maintain and educate this child and have responded to

---

[1] This answer was filed July 30, 1947.

the natural impulse of love for a child found in such unfortunate circumstances. They desire to adopt this child as their own and aver that best interests of Betty Jean Tuttle require that she remain with the respondents."

After a hearing on July 30, 1947, Judge ADAMS ordered the child returned to the Society. He expressed the view that the appointment by the Orphans' Court, of the Children's Aid Society as guardian of the minor was determinative of the question before him. He said: "in the absence of extraordinary circumstances, Common Pleas Court should dispose of the proceeding in a manner that will give effect to the judgment of the Orphans' Court." In taking this position he fell into error. He added: "However, the case will also be decided on its merits." Near the close of his opinion he said: "It is likely that adopting parents seeking a child— not to be boarded for a price, but to be their own—will develop a relationship more nearly like that of natural parents and child than exists now. The child's identity will be new in her new surrounding." In making this conjecture as to the child's future, Judge ADAMS overlooked the harm that would be done to her by the sundering of the close and affectionate relationship which has been formed between this child and the man and woman who have stood in a parental relationship toward her for more than three years. At the hearing, neighbors testified that Mr. and Mrs. Gard "have both been excellent parents, that they gave the child love and security", and that "they are very affectionate with her and she with them". One neighbor testified that "she never saw such a haunted face on a child" as this child had when she first came to the Gards' home, that the "sad look" on her face was "indescribable", and that "her appearance now spells happiness".

Witnesses described the community of Crescent Hills where the Gards reside as "very high class" and the

reputation of Mr. and Mrs. Gard as being "the very highest". Another witness described the Gards as "people of very high character and stability". One witness when asked the difference between the child as she is today and what she was when delivered to the Gards answered: "You would not know it was the same child."

This Court is now asked to order the removal of this child from its present nurturing and pleasant environment, where it has been for nearly four years and where it has developed from a child with a "sad" and "haunted" face into a child whose face registers happiness, into an utterly strange environment where it will be under the complete control of persons whose identity the Society has never disclosed to this or any other court which the Society has asked to order this child put into its keeping.

The Superior Court in its opinion reversing the judgment of the Court of Common Pleas, noted the fact that when in the oral argument before the Superior Court counsel for the Society was asked regarding the nature of the circumstances in which the Society desired this minor to be reared and cared for, he replied: "We decline to go into that. It is a secret of the Society." As to that Judge FINE, speaking for the Court, pertinently observed: "There are no secrets where the welfare of a child is concerned. For a court to award custody of a minor on a mere statement by the relator that appellants' home 'is not a suitable permanent home for this child' and that they have a more desirable home without the court knowing the pertinent factors supporting such conclusion would be to delegate the judicial function in such matters to the relator. This should not be done, and if done, constitutes an abuse of judicial discretion in circumstances where it should be most delicately exercised."

In reference to the agreement which the Society made on May 23, 1945, with Mr. and Mrs. Gard the Superior

Court correctly said: ". . . contracts as to the custody of children are voidable agreements . . . and are subject to being set aside by the courts in the best interests of the child."

The basic error in the argument made in behalf of the claim of the Society for custody of this child because of the Society's "rights" under the contract of May 23, 1945, is that the child is treated as a chattel[2] without any rights in respect to its own happiness and physical well-being. That a child cannot be made the subject of a contract with the same force and effect as if it were a mere chattel has long been established law.

An infant is the ward of the state and the latter may take the custody of the child away from even its own parents when the welfare of the child so demands. When a child is treated cruelly or is exposed to immoral or debasing conditions or is being neglected to its detriment it is the right and duty of the state, acting through its courts, to transfer the child's custody to persons who will treat the child in such a manner as to foster its well-being and promote its health and happiness. The settled law in Pennsylvania in such matters is well expressed in *Brown's Estate, Parks Appeal,* 166 Pa. 249, 252, 30 A. 1122, as follows: "At any time during minor-

---

[2] A similar error was basic in the majority opinion in the historic case of *Dred Scott v. Sandford,* 19 Howard 393, handed down on March 6, 1857. There Chief Justice Taney, speaking for the majority said: "The unhappy black race were . . . never thought of or spoken of except as property . . . the right of property in a slave is distinctly and expressly affirmed in the Constitution. The right to traffic in it, like an ordinary article of merchandise and property, was guaranteed to the citizens of the United States, in every State that might desire it, for twenty years."

Justice McLean in his dissenting opinion said: "We know as a historical fact, that James Madison, that great and good man, a leading member in the Federal Convention, was solicitous to guard the language of that instrument so as not to convey the idea that there could be property in man. . . . A slave is not a mere chattel."

ity the court will make such disposition of a minor child, whose custody is in dispute, as the circumstances of the case demand, having always in view, first and last, and controlled mainly by the consideration which will best promote the welfare of the infant."

In *Commonwealth ex rel. Manning v. Manning,* 89 Pa. Superior Ct. 301, there was an agreement entered into by husband and wife that the latter should have the custody of their children and that the former should not visit his wife or their children without her consent. The Superior Court in an opinion by Judge, now Justice, Linn held that such a contract was "not conclusive; the test is whether it is favorable or unfavorable to the 'best interest and permanent welfare' of the child." He also said: "Appellee is mistaken in suggesting that under Clifford v. Clifford, 65 Pa. Super. Ct. 110, our review is limited to the consideration of the record as on certiorari. The act of July 11, 1917, P. L. 817, passed since the decision of that case, provides that any party aggrieved by an order in any habeas corpus proceeding involving the custody of children may appeal to this court 'who shall consider the testimony and make such order upon the merits of the case either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong.' "

In re: *Custody of Minor Children of Dunbar A. Rosenthal,* 103 Pa. Superior Ct. 27, 157 A. 342, the Superior Court declared that the relationship of parent and child is a status and not a property right.

In the Restatement of the Law of Contracts, Vol. II, Section 583, there appears this comment: "Like marriage, the custody of young children is of importance to the State. It is not a property right of the parents."

Proceedings for the custody of a child are usually instituted by a petition for a writ of habeas corpus asking for possession of the child. ". . . the court . . . is not bound by any mere legal right of parent or guardian.

. . . these cases are not decided upon the legal right of the petitioner to be relieved from unlawful imprisonment or detention, as in the case of an adult, but upon the court's view of the best interests of those whose welfare requires that they be in custody of one person or another; and hence a court is in no case bound to deliver a child into the custody of any claimant or of any person, but should, in the exercise of a sound judicial discretion after a careful consideration of the facts, leave it in such custody as the welfare of the child at the time appears to require." 12 R. C. L., Section 34, p. 1215. Citing *New York Foundling Hospital v. Gatti,* 203 U. S. 429, 27 S. Ct. 53, 51 U.S. (L. ed) 254, and numerous other cases.

The case of *Chapsky v. Wood,* 26 Kansas 650, 40 American Reports 321, involved proceedings for the possession of a minor child. The parents being poor gave their daughter at birth to the mother's sister, who cared for it well for a period of 5½ years. The father having then acquired wealth and the mother having died he applied for this child. He proposed to put the child with his sister and mother, who had never seen it. The Supreme Court of Kansas denied the application. The opinion was written by Justice BREWER, who was from 1889 to 1910 a Justice of the Supreme Court of the United States. Justice BREWER admirably summed up the law applicable to cases of this character. He said, inter alia: "The father is the natural guardian and is prima facie entitled to the custody of his minor child. This right springs from two sources: one is, that he who brings a child, a helpless being, into life, ought to take care of that child until it is able to take care of itself; and because of this obligation to take care of and support this helpless being arises a reciprocal right to the custody and care of the offspring whom he must support; and the other reason is, that it is a law of nature that the

affection which springs from such a relation as that is stronger and more potent than any which springs from any other human relation. The second proposition of law is, that a child is not in any sense like a horse or any other chattel, subject-matter for absolute and irrevocable gift or contract. . . . In this it differs from the gift of any article which is only property. . . . The third proposition is, that a parent's right to the custody of a child is not like the right of property, an absolute and uncontrollable right. If it were, it would end this case and relieve us from all future difficulties. A mere right of property may be asserted by any man, no matter how bad, immoral, or unworthy he may be; but no case can be found in which the courts have given to the father who was a drunkard and a man of gross immoralities, the custody of a minor child, especially when that child is a girl. The fact that in such cases the courts have always refused the father the custody of his child, shows that he has not an absolute and uncontrollable right thereto. The fourth proposition is, that though the gift of the child be revocable, yet when the gift has been once made and the child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question whether such custody will promote the welfare and interest of such child. This distinction must be recognized. . . . ties of blood weaken, and ties of companionship strengthen, by lapse of time. . . . The fifth proposition is, that in questions of this kind three interests should be considered: The right of the father must be considered; the right of the one who has filled the parental place for years should be considered. Perhaps it may not be technically correct to speak of that as a right; and yet, they who have for years filled the place of the parent, have discharged all the obligations of care and support, and especially when

they have discharged these duties during those years of infancy when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money—when all these labors have been performed and the child has bloomed into bright and happy girlhood, it is but fair and proper that their previous faithfulness, and the interest and affection which these labors have created in them, should be respected. Above all things, the paramount consideration is, what will promote the welfare of the child?"[3]

It must not be forgotten that such a contract as the one on which the Society relies came into being *not* for the Society's benefit *but for the child's benefit,* and, therefore, it will be given only such legal effect as will serve the purpose of its creation. No guardianship is ever for the benefit of the guardian.[4]

---

[3] See *Verser v. Ford,* 37 Ark. 27; *Lyons v. Blenkin,* Jacob 245, opinion by Chancellor, LORD ELDON: *United States v. Green,* 3 Mason 482, opinion by Justice STORY; *Matter of Murphy,* 12 How. Pr. (N. Y.) 513; *Pool v. Gott,* 14 Law Reporter 269, opinion by Chief Justice SHAW of Massachusetts. In this case Chief Justice SHAW said that the father by delaying his claim for repossession of the child had "by his own acquiescence, . . . allowed the affections on both sides to become engaged in a manner he could not but have anticipated, and permitted a state of things to arise, which cannot be altered without risking the happiness and interest of his child." In *Commonwealth v. Ashton,* 8 Weekly Notes of Cases, 563, the court refused to allow a father to regain possession of a child from the latter's grandmother and denied the application on the ground that it would "exchange a certainty for an uncertainty."

[4] The doctrine of "the integrity of written instruments" as applied to the contract in this case between the Gards and the Children's Aid Society has no more materiality than it would have on a contract which a husband might enter into for the barter of his wife or child. Even in contracts involving a chattel the courts may hold the contract unenforceable as against public policy—and a child is *not a chattel.* Williston on Contracts, Revised Edition, Volume 5, Section 1628, says: "As the law forbids the actual performance of certain acts because opposed to social welfare, so it

A child of two years of age or under will form new attachments quickly if treated kindly by those into whose care it is given. In that respect it resembles a young tree whose roots have not yet taken deep hold in the nourishing earth, but when a child is much beyond the age of two years, it becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury. Even dogs which have been separated from masters to whom they are attached have been known to go into physical decline and sometimes to die as a result of that separation. To take this nearly 65 months old girl, Betty Jean Tuttle, away from the only parents she has known since she was an infant of eighteen months would be exactly the same in its effect on her and on the man and woman who have stood in a parental relationship to her for nearly four years as would the separation of any well cared for child from its own parents. Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by "kidnapping" or by legal process. In passing on the contested custody of children no judge

---

regards as obnoxious various executory agreements." The same authority also says (Volume VI, Section 1744A) : "The sovereign has an interest in a minor child superior even to that of the parent; hence, there is a public policy against the custody of such a child becoming the subject of barter: . . . Since the welfare of the child is the determining factor, the court in the exercise of its equitable powers may ignore the bargain, whether legal or illegal, and if the custody of the child has already been transferred may leave it with the transferee." (Citing numerous cases.)

can do justice without considering the human aspect of his problem.[5]

The contention made in this case, that it would be better for the child to be taken from its present home and given into the hands of persons it does not know and whose identity has never been revealed, because of the so-called "illegitimacy" of this child's birth, is an argument of such little weight as to require no refutation. It is well known that Nature in endowing children at their creation with gifts of spirit, mind and body never discriminates against the so-called "illegitimate", and the circumstances of their birth has been no blight upon their careers. Some of the greatest men and women in history were born out of wedlock. A man who served as Prime Minister of Great Britain during the present century and another exceptionally able man, who had a very large part in the establishment of the Federal Union in the last two decades of the 18th century were so-called "illegitimate" children, but that "bar sinister" did not bar their advancement and, apparently, caused them no personal disquietude. Now to separate this little girl from Mr. and Mrs. Gard would cause her far more

---

[5] In *Davies Adoption Case*, 353 Pa. 579, 46 A. 2d 252, Mr. Justice JONES, speaking for this Court said (p. 588) : "The emotional disturbance to a child that would threaten from its being removed summarily and permanently from familiar and agreeable surroundings and associations, incident to the only parental control and supervision it has ever known, could have a very harmful effect on the child's whole life. Fortunately, the law's regard for a child's welfare does not admit of any such injury or harm being done it." In that case this Court ordered that a decree of adoption of a four year old girl by the child's uncle and paternal aunt who had reared and cared for the little girl since her earliest infancy, be entered. This order was made over the objection of the child's mother, the sole surviving parent. It was held that she had abandoned the child and that therefore her consent to the proposed adoption was unnecessary. (Act of April 4, 1925, P. L. 127, Sec. 2, as amended (1 PS 2).)

anguish than any possible future malicious taunt as to the circumstances of her birth.

Societies which like the relator are entrusted by the sovereign with power over the lives of infants should ever bear in mind that consideration for the sensibilities of children and solicitude for their well-being is the hallmark of an humane individual and of a civilized state.

The judgment of the Superior Court is affirmed.

———

DISSENTING OPINION BY MR. JUSTICE PATTERSON:

The majority opinion makes it appear that the order of the court of common pleas was based on the Society's rights under the contract, irrespective of the child's welfare. Such is not the case. On the evidence, including testimony given by the Society's supervisor and its trained and experienced case worker, and the testimony of the physician who has attended the child at regular intervals since placed with the Gards, Judge ADAMS found that "the child's best interest will be served by returning her to [the Society]", and based his decision thereon. His opinion states: "In reaching our conclusion, we neither approve nor disapprove the broad general policies of the Children's Aid Society. *Our concern is the welfare of the child involved in this case.* The society's policies are only relevant insofar as they affect her. The mutual rights and obligations of the parties growing out of the signed writing and [the Gards'] continued custody were considered only insofar as they throw light upon the basic issue." Such finding, arrived at by the trial judge who heard and observed the witnesses, after careful consideration of the evidence, should not be lightly disregarded.

While it may be, as said in the majority opinion, that *nature* never discriminates against the illegitimate child, it is unfortunately true beyond question that a

less charitable *society* does so discriminate. The evidence establishes that the mother of Betty Jean Tuttle has maintained close contact with the Society at all times, and at great personal sacrifice entrusted the child to the Society on the assurance that adoption in a permanent home, carefully selected by the Society in coöperation with her, would be so arranged that the stigma of illegitimacy would be avoided. The majority decision now assures exactly the opposite. As said by Judge ADAMS in his opinion for the common pleas: "If the child remains with [the Gards] she will not escape the detrimental effect arising from public knowledge concerning her origin. This is an important aspect of the case. It is of great weight in influencing judgment."

The Gards, when they answered the Society's advertisement for foster homes, realized that such arrangement was but a temporary expedient, to provide interim care of the child, under supervision, until adoption could be arranged after careful investigation and study of the child itself as well as its prospective adoptive parents. By their contract they recognized that the Society had custody and covenanted that they would "never assert any rights, custody or control adverse to that of the Society." They agreed that the Society should have the right "to call for the return of or to remove said child from our custody at any time in its sole discretion provided only that we shall have been fully paid" and they covenanted "not to do any act or thing with a view toward adoption under pain of forfeiture of this contract and the immediate return of such child to the Society." They accepted the child for boarding home care with full knowledge of and acquiescence in the terms of the agreement, and have received full money compensation for their services. Their desire to continue the companionship of the child affords no legal basis for permitting them to evade their solemn written obligation, now that the purpose of the agreement has been fulfilled,

against the findings of the trial judge, the wishes of the mother, and the recommendation of the Society.

Mr. Chief Justice MAXEY, the writer of the majority opinion in the present case, recently said in the case of *Jones v. Schaefer*, 357 Pa. 628, 637, 55 A. 2d 387, "This court has frequently in its decisions manifested its respect for the integrity of written instruments . . ." Had the Gards released the child to the Society, upon request, as agreed, they would have no standing to maintain habeas corpus to regain custody. Their position would be that of a "mere stranger or volunteer who is in no way entitled to the custody, or responsible for the welfare of the child", and the question of the best interests of the child would not be considered in such proceeding: *Commonwealth ex rel. Ebel v. King*, 162 Pa. Superior Ct. 533, 537, 58 A. 2d 484. By its decision that a different status can be acquired through the simple expedient of deliberate violation of the contract, the majority places a premium on disrespect for written obligations, solemnly entered into, and jeopardizes the effective operation of the Society and other similar agencies throughout this State. In the one case, as in the other, orderly procedure requires that the boarding home contract be enforced according to its terms, and, if the party or parties who have temporarily taken care of the child, for a consideration, under such a contract, should desire permanent custody or adoption, the question of their fitness can be determined upon a proper application for the purpose, as in other cases. Ample power exists in the courts to protect the rights of all concerned. The Society cannot arbitrarily place the child in a permanent home without approval of the courts. Such power and authority is always retained by the court under all circumstances in the best interests of the child. A court may in a proper case take a child from one or both natural parents and it can also take its custody from the Chil-

dren's Aid Society. Under the law the controlling factor must always be what is best for the child.

I would reverse the judgment of the Superior Court and affirm the Court of Common Pleas of Allegheny County insofar as the order of that court enforces the contract between the parties with the court retaining full authority to determine the child's custody in a proper proceeding.

Mr. Justice DREW joins in this dissent.