361 A.2d 294
**In re ADOPTION OF R. I.**
**Appeal of MOTHER.**

Supreme Court of Pennsylvania.

Argued Sept. 22, 1975.

Decided July 6, 1976.

288

S. Sanford Kantz, New Castle, for appellant.

Kenneth E. Fox, Ellwood City, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT

ROBERTS, Justice.

On February 24, 1972, R. I.'s foster parents filed a report of intention to adopt R. I. and a petition to terminate the parental rights of R. I.'s natural parents.[1] The Orphans' Court Division of the Court of Common Pleas of Lawrence County, after a hearing, entered a decree terminating the parental rights of R. I.'s natural parents. Appellant (the natural mother) appealed to this Court. We vacated the decree and remanded to the orphans' court because it was not shown that appellant waived her right to counsel.[2] *In re: Adoption of R. I.,* 455 Pa. 29, 312 A.2d 601 (1973).

The orphans' court appointed counsel for appellant and conducted a second evidentiary hearing. On April 8, 1975, the court terminated appellant's parental rights in accordance with section 311(2) of the Adoption Act[3] (hereinafter section 311(2)). Its action was based on findings that appellant had repeatedly and continuously neglected R. I., that the neglect had deprived R. I. of essential parental care, and that this neglect could not and would not be remedied in the future. Appellant

1. See Adoption Act, Act of July 24, 1970, P.L. 620, art. III, §§ 312, 331, 1 P.S. §§ 312, 331 (Supp.1975).

2. Our decision did not vacate that part of the orphans' court decree terminating the parental rights of R. I.'s natural father. He neither appeared to oppose the petition nor appealed the orphans' court decree.

3. Act of July 24, 1970, P.L. 620, art. III, § 311(2), 1 P.S. § 311(2) (Supp.1975).

appealed [4] claiming that the evidence presented to the hearing court was insufficient to support these findings. We affirm.

The scope of our review is limited to determining from the record whether the hearing court's findings are supported by competent evidence. *Schaeffer Appeal,* 452 Pa. 165, 305 A.2d 36 (1973); *Vaders Adoption Case,* 444 Pa. 428, 282 A.2d 359 (1971); *Hookey Adoption Case,* 419 Pa. 584, 215 A.2d 860 (1966); *Harvey Adoption Case,* 375 Pa. 1, 99 A.2d 276 (1953).

R. I., was born on December 6, 1964. On April 27, 1967, R. I., who was the second youngest child, and her six brothers and sisters were removed from appellant's home. The removal occurred after numerous attempts by school officials and social workers to provide adequate in-home assistance. On May 12, 1967, the Lawrence County Juvenile Court awarded custody of the children to the Lawrence County Child Welfare Services (hereinafter "welfare services").

R. I.'s removal was prompted by circumstances which seriously endangered her welfare. She suffered from malnutrition at the time of removal: she was extremely underweight, had a hole in her chest, was unable to swallow her food, and was unable to move her bowels. In addition, R. I. had numerous bleeding sores on her body; her scalp was covered with scabs; and her hair was matted in these scabs. On at least one occasion all of the children were found sleeping on a concrete floor. There was testimony, which the hearing court chose to believe despite appellant's denial, that this was a regular occurrence. There was also disputed testimony, which was not resolved in the hearing court's opinion, that appellant had no clothing for R. I. at the time R. I. was removed.

R. I.'s foster mother and a social worker who attended to R. I. upon removal testified that R. I. needed immedi-

4. See Appellate Court Jurisdiction Act, Act of July 31, 1970, P.S. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1975).

ate medical attention, which the foster parents provided, and that R. I. suffered the physical effects of this severe neglect for at least several months.[5]

R. I.'s removal from her parents was also precipitated by the general circumstances of her family. Her father had a severe alcoholic problem, had lost his job a year before removal and had no prospects or apparent desire for employment in the future. As a result of his refusal to seek work, the family lost its public assistance grant. The lack of financial resources and appellant's total inability to plan for her family's care forced her, on at least one occasion, to seek emergency help because she had no funds to buy necessary groceries. In addition, the family had been evicted from their home the month before removal and had been forced to move into quarters totally inadequate for a family of nine. Appellant and her husband had no prospect of obtaining adequate housing in the near future.[6]

R. I. was placed in a foster home immediately after removal in 1967 and has since lived with the same foster parents. Appellant visited R. I. regularly until December 1969, when welfare services refused to allow further visitation rights. This action was prompted by complaints from the foster parents that the visits caused R. I. severe emotional distress. Appellant has not seen R. I. since.

5. R. I.'s infant brother, who also had a swollen stomach at the time of removal, died three days after removal. However, the record does not disclose the cause of death. There is no evidence concerning whether appellant ever sought medical attention for R. I.

6. There was also extensive testimony concerning acts of parental abuse and neglect against R. I.'s older siblings. This includes evidence that appellant was unable to control or discipline R. I.'s older siblings and that R. I.'s father physically abused other children. Appellant argues that this evidence does not provide sufficient support for the orphans' court's finding of continued neglect under section 311(2). This claim is without merit because, ignoring the evidence of abuse and neglect against other children, there is sufficient evidence to support the orphans' court's decree.

R. I.'s caseworker testified at the termination hearing that it was the welfare services' original intention to reunite R. I.'s family. To this end, she and her successors met with appellant on several occasions. The principal conditions for such a reunion were that appellant and her husband must find adequate housing and must exhibit ability to care for the family financially. Originally, welfare services intended to return the children one at a time, beginning with R. I.'s older siblings, gradually reuniting the family as the parents showed an ability to care for the children.

Appellant made diligent efforts to satisfy these conditions and showed an unswerving devotion to her children. She sought employment and began working long hours to meet the welfare services' financial requirements. She and her husband also sought a new residence, but, except for one period which lasted only one week, they have never succeeded in finding quarters large enough for more than one or two children. Her efforts have been handicapped by the necessity of caring for her seriously ill husband. His health has deteriorated to such an extent that he seldom leaves his home, but he refuses to seek medical help. He has not sought employment since 1967 and has made no efforts to help appellant regain custody of R. I.

Appellant admitted at the termination hearing that she is currently unable to care for any but her two oldest children.[7] She also testified that whenever she contacted

7. Appellant gave the following testimony when questioned by the hearing judge:

"THE COURT: As I understand what you're saying at this time is that as far as you are concerned that you're in position, you believe, to ask for the return of your two older boys, and those are the ones you're asking for now. Is that right?
*Witness:* Yes.

THE COURT: But that you don't believe you are in a position to ask for the return of all the children at this time?
*Witness:* No, I want them, but I just can't—

welfare services she asked for the return of these two boys, whom she believed she could support. Although she has shown an interest in being reunited with R. I. in the future, her testimony shows agreement with welfare services that such a reunion must be postponed. Her long working hours, the inadequate housing, the severe neglect of the past, and the ill-health and indifference of her husband preclude any other result.

The orphans' court decree terminating appellant's parental rights to R. I. is based upon section 311(2), which provides that parental rights may be terminated if:

"(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent."

Courts are forced to make extremely difficult choices under this provision because of the conflicting interests which it embodies. On the one hand, the Commonwealth has a strong interest in protecting the child from parental abuse and neglect. To this end, Pennsylvania law places affirmative duties upon a parent to love, protect and support one's child:

" 'Parenthood is not . . . a mere biological status, or passive state of mind which claims and declines

THE COURT: You couldn't do it?
*Witness:* No.

THE COURT: You have no place for them?
*Witness:* Not now. But for the two oldest boys—yes.

THE COURT: You would be in position to ask for them?
*Witness:* Yes.

THE COURT: But you couldn't ask at this time, under your present circumstances, to have the other children returned in addition to the two older boys? Isn't that your position?
*Witness:* Not at this time, no."

These statements by appellant to the court contradicted in part her earlier testimony under cross-examination that she might also be able to take back R. I.

to relinquish ownership of the child. It is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern. . . . [A parent] must exert himself to take and maintain a place of importance in the child's life, and must exercise reasonable firmness in declining to yield to obstacles. Otherwise, he cannot perform the job of parent, and the parent-child relationship will deteriorate as the absent parent more and more gives his thoughts, attentions, concern and priorities to his own life and associates.' "

*Appeal of Diane B.*, 456 Pa. 429, 433, 321 A.2d 618, 620 (1974) (quoting *Adoption of JRF*, 27 Somerset L.J. 298, 304–05 (Pa.C.P.1972)); see *McAhren Adoption Case*, 460 Pa. 63, 331 A.2d 419 (1975); *McCray Adoption Case*, 460 Pa. 210, 331 A.2d 652 (1975); *Wischman Adoption Case*, 428 Pa. 327, 237 A.2d 205 (1968); *Smith Adoption Case*, 412 Pa. 501, 194 A.2d 919 (1963). Although neither removal nor termination is justified when a parent fails to meet all of these high standards, the Commonwealth, in its capacity as parens patriae may intervene and terminate parental rights to protect the child when parental conduct amounts to continuous neglect under section 311(2).

 However, because of the importance placed on the family, the Commonwealth may disrupt the parent-child relationship only upon a clear showing of necessity. Judge Woodside described the limited power to remove in *Rinker Appeal*, 180 Pa.Superior Ct. 143, 148, 117 A.2d 780, 783 (1955):

"It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. . . .

"A child cannot be declared 'neglected' merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy." [8]

Moreover, even if removal is necessary to protect the child, every effort should be made to reunite the family.[9]

8. See *Stapleton v. Dauphin County Child Care Services*, 228 Pa. Super. 371, 386, 324 A.2d 562, 570 (1974).

 Many writers agree that, because of the severe psychological and emotional distress that may occur, removal should be contemplated only when the child cannot be protected with less drastic intervention. See Foster, Adoption and Child Custody: Best Interests of the Child?, 22 Buff.L.Rev. 1, 11 (1972) ("[r]emoving a child from the warmth and security of the place he knows as home should be done only in the most compelling circumstances"); Mnookin, Foster Care—In Whose Best Interests?, 43 Harv.Ed.Rev. 599, 631 (1973) (removal should occur only when the state proves that "(a) there is an immediate and substantial danger to the child's health; and (b) there are no reasonable means by which the state can protect the child's health without removing the child from parental custody").

9. The Juvenile Court Act, which authorizes removal, must be interpreted and construed to "preserve the unity of the family whenever possible." Juvenile Act, Act of December 6, 1972, P.L. 1464, § 1(b)(1), 11 P.S. § 50–101(b)(1) (Supp.1975). See also Dept. of Public Welfare Regulation §§ 2–1–17, 2–1–27 (5 Pa. Bulletin 2199, August 23, 1975) (petition for adoption of child whose parents have neglected to provide necessary care and protection may be filed if neglect has not been remedied "even with the help of community resources"; "[t]he following services, if needed, shall be made available to natural parents either directly or by referral:—counseling;—legal services;—educational services;—financial assistance;—housing services"). These provisions evince a legislative intent that families which have been disrupted by the removal of children be provided with available resources so that the causes of removal may be remedied and the family may be reunited.

Termination of parental rights following an extended period of removal, because of its finality, has even stricter standards. This Court has described it as "one of the most severe steps the court can take" because of "the great emotional impact on both the child and the parent." *Sarver Adoption Case,* 444 Pa. 507, 281 A.2d 890 (1971). Thus, in determining whether a parent's neglect of his or her children is serious enough to meet the requirements of section 311(2), this Court requires a "demanding" standard of "compelling" evidence. *In re Geiger,* 459 Pa. 636, 637, 331 A.2d 172, 173 (1975); *Jones Appeal,* 449 Pa. 543, 547, 297 A.2d 117, 119 (1972). We have refused to allow termination when the decree is based in part on hearsay or other inadmissible evidence. *Sanders Appeal,* 454 Pa. 350, 312 A.2d 414 (1973); *Jones Appeal,* supra. We also require that the natural parent be given the right of assistance of competent counsel. *In re: Adoption of R. I.,* supra.

In order to ensure that a parent-child relationship is terminated pursuant to section 311(2) only when such an action is clearly warranted this Court requires a compelling showing of three factors:

> "(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

*In re Geiger,* supra 459 Pa. at 639, 331 A.2d at 174.[10]

10. In dissent, Mr. Justice Manderino states that this Court has always required a showing of "willful misconduct" by the parent before termination of parental rights is permitted. To the contrary, this Court has never used the term willful misconduct and has never imposed any similar requirement. Nor could the statutory language permit such an interpretation. Under section 311 of the Adoption Act, parental rights may be terminated if: (1) a

■ The facts of this case offer sufficient support for the trial court's finding that all of these requirements are met. R. I.'s physical condition and the condition of her family at the time she was removed from her parents compels a conclusion that she was exposed to "repeated and continued" parental neglect or incapacity to provide essential care and subsistence. Appellant was unable to provide R. I. basic food and shelter. Despite in-home efforts prior to removal, R. I.'s physical condition deteriorated. Her father was indifferent to her plight, and appellant's efforts were inadequate to change this unfortunate situation. Removal became necessary to protect her

parent "failed to perform parental duties" for a period of six months, or (2) there has been "repeated and continued incapacity . . . [of] the parent" which has caused the child to be without essential care and the conditions of the incapacity "cannot" be remedied. This Court has consistently held that "parental duties" and "parental care," as used in the Adoption Act, comprise numerous affirmative obligations on the part of the parent. See, e. g., *McAhren Adoption Case*, 460 Pa. 63, 331 A.2d 419 (1975); *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974). A mere "desire" to perform parental duties is insufficient to preserve the parent-child relationship. *Appeal of Diane B.*, supra at 434, 321 A.2d at 621.

Certainly, the Court must look to the circumstances of the parent's inability or failure to care for his or her child. In the case of alleged abandonment, a parent's failure to perform parental duties is excused if he or she provides temporary care for the child or uses "all available resources" during a period of personal crisis to maintain the parent-child relationship and to preserve a place of importance in the child's life. *Re: Adoption of M. T. T.*, 467 Pa. 88, 354 A.2d 564 (1976); *In re Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975); *McAhren Adoption Case*, 460 Pa. 63, 331 A.2d 419 (1975); *Wolfe Adoption Case*, 454 Pa. 550, 312 A.2d 793 (1973). In the case of continued incapacity or neglect, termination of parental rights is justified only if it is shown that the parent will not remedy the causes of that incapacity or neglect. *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975). A parent's "willful misconduct" is not, as the dissent asserts, the controlling factor in determining whether any of these circumstances exist.

The dissent also states that section 311 would be unconstitutional unless read to require a showing of "willful misconduct." We decline to ignore the plain language of the statute. Because the issue of the constitutionality of section 311(2) was neither raised before the hearing court nor urged on this appeal, it is not preserved for our review. *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975).

welfare. The events of the last eight years offer compelling evidence to support the final requirement, that the causes of the neglect or incapacity cannot or will not be remedied. Appellant, despite her efforts and despite the assistance offered by welfare services, has been unable to remedy the conditions which caused R. I.'s initial removal. Even if we assume that welfare services erred in refusing to allow the older boys to return to their parents, the fact remains that R. I. cannot be cared for by appellant, as appellant herself admits.[11]

This Court's decision in *Geiger* supports our conclusion. There, we held there was not "compelling" evidence to show that the children were "without essential parental care, control or subsistence." The hearing court had terminated appellant's parental rights based on disputed testimony by social workers. They stated: that the children's home was "submarginal" and "was setting a cultural standard which would be a deprivation in the future"; that the parents had serious marital difficulties; that the mother was mentally retarded; and that the family was very poor. However, there was undisputed evidence that the children were not undernourished, received ample food, had adequate clothing and were in generally good health. Thus, the trial court in *Geiger* sanctioned removal of children from their parents and termination of parental rights merely because the children were poor and culturally deprived. Section 311 (2) requires more demanding evidence of serious ne-

11. In dissent, Mr. Justice Manderino asserts that our decision here "will forever preclude [a] reunion" between R. I. and her natural mother. As our holding in *Geiger* demonstrates, parental rights may not be terminated unless it is affirmatively shown by compelling evidence that appellant's inability to care for R. I. cannot or will not be remedied. Thus, the dissent would deny R. I. the benefits of a family through adoption and continue the long period of temporary care to protect a possible reunion which has been shown will not occur. Many commentators have noted the detriments of providing indefinite periods of foster care, the inevitable result of the dissent's position. See *infra*, note 14.

glect, evidence which is clearly present in the case before us.

■ Finally, our decision is supported by examining R. I.'s current circumstances.[12] She has lived with her foster parents for over eight years and has had no contact with appellant for six years. Appellant has been unable to offer R. I. parental care and control since R. I. was two and one half years old. R. I.'s foster parents, who now wish to adopt her, have filled that void and have become the only "parents" that R. I. knows. Even if appellant's rights were not terminated, R. I. would undoubtedly remain with her foster parents.[13] R. I.'s welfare would be promoted by allowing her indefinite "temporary" status as a foster child to be changed to the permanent status as an adoptive child.[14]

12. The best interests of the child cannot be considered in a proceeding to terminate parental rights until after a finding that the statutory requirements for termination have been met. *McAhern Adoption Case,* 460 Pa. 63, 68, 331 A.2d 419, 422 (1975); *Battle Adoption Case,* 456 Pa. 553, 558, 321 A.2d 622, 624 (1974); *Gunther Adoption Case,* 416 Pa. 237, 242, 206 A.2d 61, 64 (1965); *Schwab Adoption Case,* 355 Pa. 534, 542, 50 A.2d 504, 508 (1947); *Davies Adoption Case,* 353 Pa. 579, 588, 46 A.2d 252, 256–57 (1946). Thus, we consider R. I.'s best interests to support the orphans' court's decree only because the statutory requirements of section 311(2) have been met in this case.

13. R. I.'s best interests would dictate who should have custody in such circumstances. See *Sarver Adoption Case,* 444 Pa. 507, 281 A.2d 890 (1971); *Schwab Adoption Case,* 355 Pa. 534, 50 A.2d 504 (1947).

To remove R. I. from her foster home might well create psychological and emotional distress similar to that caused by her initial removal from her natural parents. See *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 97, 66 A.2d 300, 306 (1949); *Commonwealth v. Stouffer,* 224 Pa.Super. 556, 307 A.2d 411 (1973); *In re E.,* Del., 239 A.2d 626 (1968); Foster, *supra* note 8 at 11–14.

14. The Juvenile Court and welfare services retain supervisory control over R. I. and her foster parents' right to her custody remains uncertain so long as R. I. remains a foster child. See Act of December 6, 1972, P.L. 1464, §§ 24, 30, 11 P.S. §§ 50–321, 50–327 (Supp.1975). But see *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 562, 324 A.2d 562 (1974). Many commentators have criticized the use of "temporary" foster care for

Because there is compelling evidence to support the trial court's finding of continued and repeated neglect under section 311(2) and because R. I.'s welfare would be promoted by terminating appellant's parental rights, we affirm the orphans' court decree.

Decree affirmed; each party pay own costs.

NIX, J., filed a dissenting opinion.

MANDERINO, J., filed a dissenting opinion.

NIX, Justice (dissenting).

I cannot accept the view that the rights of a natural parent may be terminated involuntarily without the showing of willful neglect or fault on the part of the parent. Such a broad, sweeping interpretation of Section 311(2) of the Adoption Act of 1970 would unnecessarily permit an irreparable severance of the parent-child relationship in numerous instances where the parent has no control over the family's adverse circumstances. Under the majority's reasoning, the application of Section 311(2) would be appropriate even in those tragic instances where the parent is confined to a medical or mental hospital and it cannot be determined whether the conditions and causes of the incapacity can or will be remedied by the parent.

In the instant case the mother lost custody of all her children in 1967. Since that time she has worked tirelessly to improve her situation in an effort to regain custody of the children and provide a proper home environment. While admittedly she is presently unable to ask for the return of all the children, she believes she can now care for the two eldest. Additionally, she has ex-

indefinite periods. See, e. g., Levine, Caveat Parens: A Demystification of the Child Protection System, 35 U.Pitt.L.Rev. 1, 19–22 (1973); Mnookin, supra n. 8; Note, The Rights of Foster Parents to the Children in Their Care, 50 Chi.-Kent L.Rev. 86 (1973).

pressed a sincere concern for the welfare of the others and her actions demonstrate an unequivocal determination to take those steps which are necessary for her to be reunited with her family. However, even assuming that circumstances beyond her control make it impossible for appellant to achieve her goal, it would be manifestly unjust for the state to deprive the parent of any future union or relationship with her natural child.

Accordingly, I would reverse the decree of the court below.

MANDERINO, Justice (dissenting).

Appellant seeks to retain her parental rights to her daughter R. I., and to eventually regain custody of R. I. Since 1967, when appellant lost custody of all her children, she has worked hard to improve her situation, so as to be able to provide a good home for them. Appellant, however, is a victim of her circumstances: long working hours, inadequate housing, and the ill health and indifference of her husband have hindered her progress and made a reunion with R. I., impossible at the present time. The majority opinion will forever preclude such a reunion, despite all of appellant's attempts to remedy the situation. I must strongly dissent.

According to the majority opinion, under Section 311(2) of the Adoption Act of 1970, parental rights can now be involuntarily terminated without a showing of fault or any willful misconduct on the part of the parent. However, because of its recognition of the seriousness of a finding of abandonment, this Court has consistently imposed a strict burden of proof of some sort of willful misconduct on the part of the parent before involuntarily terminating parental rights. *See, e. g., Re: Adoption of M. T. T.*, 467 Pa. 88, 354 A.2d 564 (filed March, 1976); *In re Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975); *In re Adoption of McAhren*, 460 Pa. 63, 331 A. 2d 419 (1975); *In re Adoption of Wolfe*, 454 Pa. 550,

312 A.2d 793 (1973). Be it to show a relinquishing of parental claims to a child, the refusal or failure to perform parental duties, or continued neglect or abuse, we have always required, under both the old and new adoption laws, a showing of willful misconduct. Here, despite appellant's intention to create a better home for her children, the majority has held that her present "incapacity" to provide "essential parental care, control or subsistence" cannot be remedied and is, therefore, a sufficient basis for terminating appellant's parental rights.

I cannot agree. Not only is the majority opinion contrary to the long line of adoption cases decided by this Court, but its interpretation of Section 311(2) renders the statute unconstitutional. Unless we interpret Section 311(2) to include an element of willfulness we are allowing such persons, because of conditions over which they have no control, to be irreparably deprived of their rights to remain parents. Since we are required by Section 1922(3) of the Pennsylvania Consolidated Statutes, 1 Pa.C.S. § 1922(3), to interpret all statutes in a light which makes them constitutional, Section 311(2) should be read to require a showing of willful misconduct.

I would therefore reverse the decree of the lower court.