Circulated 08/27/2025 10:33 AM

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| H. J P( | : | No. 00950 of 2024 |
| | : | |
| | : | INVOLUNTARY TERMINATION |
| IN RE: | : | |
| | : | |
| L. Gl P( | : | No. 00951 of 2024 |
| | : | |
| | : | INVOLUNTARY TERMINATION |

## OPINION *SUR* APPEAL

This opinion is written in response to two appeals from this court's respective Decrees which involuntarily terminated the parental rights of F W. P( as birth father (hereinafter, "Father") to his daughters H J P (date of birth: August , 2013; hereinafter, "HJP") and L G P( (date of birth: September 2019; hereinafter, "LGP"). The two children are referred to collectively in this opinion as the "Children".

### PROCEDURAL HISTORY OF TERMINATION OF PARENTAL RIGHTS CASE

Petitioners C K. (hereinafter, "Mother") and K R K: r (hereinafter, "Stepfather") filed a Petition for Adoption and Termination of Parental Rights on April 19, 2024[1], by their counsel, Anne M. Gibson, Esquire, for HJP and LGP. The Respondent, F W P , III (hereinafter, "Father") was served by the Forest County Sheriff's Office with

---

[1] Petitioners filed an Amended Petition For Adoption and Termination of Parental Rights on August 8, 2024.

the two Petitions for Adoption and Termination of Parental Rights on June 24, 2024. By Order dated May 16, 2024, H. Allison Wright, Esquire, was appointed to represent Father in both matters. By Orders dated September 5, 2024, Jeffrey S. Shank, Esquire, was appointed as legal interest attorney for the Children.

The court held hearings on the termination of parental rights petitions on October 31, 2024[2], and on February 6, 2025. The Decrees terminating Father's parental rights to the Children were docketed on February 18, 2025. Father timely filed a Notice of Appeal for each Child on March 5, 2024, together with his Statement of Errors Complained Of On Appeal. The court issued orders dated March 6, 2025, directing counsel to address Father's Statement of Errors Complained Of On Appeal for each Child by March 20, 2025. Counsel complied and timely filed separate Answers for each Child.

## FINDINGS OF FACT

1. LGP was born September    , 2009. (N.T. 02/06/2025 at page 4)

2. HJP was born August    ., 2013. (N.T. 02/06/2025 at page 15)

---

[2] Father initially indicated a willingness to sign a Confirmation of Consent to voluntarily terminate his parental rights to the Children; however, he ultimately did not do so.

-2-

3. Mother and Stepfather have been together for approximately nine years. They were married on August 24, 2019. (N.T. 02/06/2025 at page 27)

4. Mother and Father were not married and ended their relationship in 2014. (N.T. 02/06/2025 at page 27)

5. Stepfather has provided the Children with their basic needs and emotional support and helps Mother to take care of the Children's daily needs. (N.T. 02/06/2025 at pages 69-70)

6. Stepfather wishes to adopt both Children. (N.T. 02/06/2025 at page 70)

7. Prior to ending of the relationship between Mother and Father in 2014, Father was addicted to heroin. (N.T. 02/06/2025 at page 31 and at page 97)

8. In 2015 and 2016, Father had only a few weekends of physical custody with the Children. Father testified that after his relationship with Mother ended, he only had two weekends of physical custody with the Children. (N.T. 02/06/2025 at page 33 and at page 86)

9. Mother and Stepfather credibly testified that the last in-person contact Father had with the Children occurred on Father's Day of 2017. (N.T. 02/06/2025 at page 33 and page 68)

10. Father has had no in-person contact or telephone contact with the Children since Father's Day 2017. (N.T. 02/06/2025 at page 7, at page 34)

11. Mother retains the same mobile telephone number that she has had since before her relationship with Father began. (N.T. 02/06/2025 at page 35)

12. Father has called Mother on her telephone and he knows how to reach Mother by telephone. (N.T. 02/6/2025 at page 79)

13. Prior to the dissolution of their relationship in 2014, Mother and Father lived together at Mother's parents' home. (N.T. 02/06/2025 at page 46)

14. Father has never contacted Mother's parents, either in person or via telephone, nor has he ever sent cards, letters, or presents to Mother's parents for delivery to the Children. (N.T. 02/6/2025 at page 46)

15. Father has never sent the Children any letters or gifts. (N.T. 02/06/2025 at page 89)

16. Father has performed no parental duties for the Children since 2018. (N.T. 02/06/2025 at page 104)

17. Between 2017 and 2022, Father was homeless for approximately two years. (N.T. 02/06/2025 at page 101)

18. In 2020, Mother served Father with a complaint in custody regarding the Children by publication, as Mother did not know Father's whereabouts. (N.T. 02/06/2025 at page 65)

19. A custody conciliation conference was held on May 12, 2020. Father did not attend. (N.T. 02/6/2025 at page 37 and page 65; Petitioners' Exhibit 1)

-4-

20. The resulting custody order dated May 13, 2020, granted Mother sole legal and physical custody of the Children. (N.T. 02/06/2025 at page 37; Petitioners' Exhibit 1)

21. Per the custody order, Father was not permitted to have any contact with the Children until he filed an affidavit of criminal history and petitioned the court for contact. (N.T. 02/06/2025 at page 37; Petitioner's Exhibit 1)

22. Father never filed an affidavit of criminal history nor did he file a petition for modification of the custody order. (N.T. 02/06/2025 at page 105)

23. Father is presently incarcerated in state prison for Drug Delivery Resulting in Death, a felony of the first degree. (N.T. 02/06/2025 at page 87; Petitioners' Exhibit 2)

24. Father plead guilty to the charge in December of 2022 and is serving a minimum of five to ten years incarceration in state prison. (N.T. 02/6/2025 at page 95; Petitioners' Exhibit 2)

25. The earliest date Father could be paroled from state prison is April 4, 2027. (N.T. 02/06/2025 at page 89 and at page 111)

26. After he was incarcerated, Father called Mother to arrange contact with the Children, but Father ultimately decided to wait until he is released from prison to have such contact. (N.T. 02/06/2025 at page 40)

-5-

27. During his incarceration, Father has called and spoken with Mother approximately five times. The last of these telephone calls occurred on December 23, 2022. (N.T. 02/06/2025 at page 42)

28. Father has had no in person contact with the Children since 2017, nor has he spoken with them, nor has he sent them any letters, cards, or gifts. (N.T. 02/06/2025 at page 45)

29. Father never discussed sending cards or gifts to the Children with Mother, nor did he ever ask for her new address. (N.T. 02/06/2025 at page 108)

30. Mother obtained a domestic relations child support order against Father. Father made only sporadic child support payments pursuant to the order and has paid nothing since 2017. Father owes over tens of thousands of dollars in child support to Mother. (N.T. 02/06/2025 at pages 47-50)

31. Father agrees that the Children's adoption by Stepfather is in their best interest, he was unable to bring himself to voluntarily relinquish his parental rights. (N.T. 02/06/2025 at pages 112-114)

32. Father agreed to consent to the adoptions as a ruse. Father's deception was calculated to prolong the legal process and delay the Children's adoption. (N.T. 02/06/2025 at page 112)

33. Father incorrectly believed that LGP was fourteen years old instead of her correct age of fifteen. (N.T. 02/06/2025 at page 111).

34. LGP views Stepfather as her father and acknowledges that Stepfather performs parental duties. (N.T. 02/06/2025 at pages 8-9)

35. HJP refers to Stepfather as her father. HJP wishes to be adopted by Stepfather. (N.T. 02/06/2025 at pages 13-14 and at page 19)

## CONCLUSIONS OF LAW

1. The Petitioners proved by clear and convincing evidence that:

(a) Father, by conduct continuing for more than a period of six months preceding the filing of the petition, either has evidenced a settled purpose of relinquishing parental claim to the Child or has refused or failed to perform parental duties. [23 Pa.C.S.A. § 2511 (a)(1)]

(b) Because of Father's repeated and continued incapacity, abuse, neglect and refusal of Father, Father has caused the children to be without essential parental care, control or subsistence necessary for the children's physical or mental well-being and the conditions and causes of the

-7-

incapacity, abuse, neglect or refusal cannot or will not be remedied by Father. [23 Pa.C.S.A. § 2511 (a)(2)]

2. The Petitioners proved by clear and convincing evidence that termination of Father's parental rights will best serve the developmental, physical, and emotional needs and welfare of the Child because the Child is in need of a nurturing, loving and a stable home environment, which Father has failed to provide, and the severance of the bond between the Child and Father will have little impact upon the Child. [23 Pa.C.S.A. § 2511 (b)]

## DISCUSSION

In termination of parental rights cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re S.H.*, 879 A.2d 802, 806 (Pa.Super. 2005)

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)

In matters involving involuntary termination of parental rights, the appellate standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of

-8-

discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* At [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See in re R.J.T.,* [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].
*In re T.S.M.,* 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.,* 855 A.2d 68, 73-74 (Pa.Super. 2004)(citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003)(citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa. C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super. 2007)(citations omitted).

1.(a).    Termination pursuant to 23 Pa. C.S.A. § 2511(a)(1)

There are two approaches to a finding of grounds for termination of parental rights under this subsection of the statute.  Both require the court to examine the period of at least six months prior to the filing of the petition.  If, during that period of time, a parent exhibits (1) a settled purpose or intent to relinquish a parental claim **OR** (2) a failure to perform parental duties, the court may then conclude that grounds to terminate exist.

In this case, the subject amended petitions were filed on August 8, 2024.  Six months prior to that date would be February 8, 2024.  Mother, Stepfather, and LGP testified that the last time Father saw the Children was Father's Day of 2017, but even if Father's testimony is accurate that the last date Father had contact with the children was in 2018[3], Father plainly has had no relationship with the Children and has performed no parental duties for not less than six years.  In this time period, Father did not speak with the Children, nor did he send them any letters or gifts.  Father did not financially support the Children to any meaningful extent either.  As of the time this opinion is being written, Father is a stranger to the Children.

---

[3]    Father testified to his belief that he last had contact with the Children in the summer of 2018.  (N.T. 02/06/2025 at page 78)

-10-

Our appellate courts have instructed trial court's to refrain from a mechanical application of the six-month period preceding the filing of the petition for termination of parental rights, but rather to consider the entire history of the case. In following this precept, it is evident that Father has not performed any parental duties as the Superior Court has defined them for a period extending back well beyond the six-months time period.

As the Superior Court has explained: "There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of a child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance...Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004)

In the present case, Father did not exert himself to take and maintain a place of importance in the Children's lives. Father failed to demonstrate anything approaching reasonable firmness in attempting to maintain contact with the Children. By

-11-

his own hand, once his relationship with Mother ended, so too did his relationship with the Children.

In summary, grounds for the termination of Father's parental rights under § 2511 (a)(1) have been proven by clear and convincing evidence.

1.(b).    Termination pursuant to 23 Pa. C.S.A. § 2511(a)(2)

Parental rights may be terminated under Section 2511(a)(2) if three conditions are met: "(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Geiger*, 459 Pa. 636, 331 A.2d 172, 174 (1975)

"Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for "essential parental care, control or subsistence necessary for his physical or mental well-being." *In re E.A.P.*, 944 A.2d 79, 83 (Pa.Super. 2008), citing *In re R.I.*, 468 Pa. 287, 361 A.2d 294 (1975).  The grounds for termination under this subsection "are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental

-12-

duties." *Id.* at 83, citing *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

Incarceration "while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to 23 Pa. C.S.A. § 2511(a)(2)." *In re Adoption of S.P.*, 47 A.3d 830 (Pa. 2012).

Father abandoned the Children from Father's Day 2017 to present. He has not provided any parental care to the Children. Father testified that he was actively addicted to drugs and that he did not wish for the Children to see him. Father did not maintain any contact with the Children from 2017 until present. Father's abdication from the Children's lives meant that the Children were entirely reliant upon Mother and Stepfather for every manner of essential parental care. Ultimately, Father was incarcerated for felony Drug Delivery Resulting in Death. The earliest possible date upon which Father could be released is April 4, 2027.

Since Father's incarceration, he has not pursued nor has he had any visits with the Children or had any contact with the

-13-

Children, nor has he sent the Children any letters or gifts. Father's lengthy incarceration will continue to at least 2027. There is no evidence in the record that Father has made any attempts to perform parental duties during his incarceration or that he might in the future until after his release. Through his own inaction, Father was not in the Children's lives before or since his incarceration. Per *In Re S.P*, *supra*, Father's remaining lengthy incarceration alone is not dispositive. However, when viewed in the light of Father's conduct before and after his incarceration, it becomes clear to the court that Father's incapacity and/or refusal to perform parental duties will continue with no foreseeable end in sight.

2. <u>Needs and welfare of the child pursuant to 23 Pa. C.S.A. §</u> <u>2511(b)</u>

The court must next determine whether terminating Father's parental rights to the Children will best serve the developmental, physical, and emotional needs and welfare of the Children. See, 23 Pa. C.S.A. § 2511 (b). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) An examination of the parent-child bond is required, where the court must assess the effect upon the child of severing that bond. Expert testimony is

-14-

not required.  See *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008)

Both Children testified that they consider Stepfather to be their father.  Father's total dereliction of parental duties ensured that the Children have no detectable bond with Father. Terminating Father's parental rights to the Children will not negatively impact the Children's emotional well-being whatsoever, as after years of inaction Father has erased himself from the Children's lives.  By any measure, for at least six years, Father has not provided the Children with love, comfort, or security. There is no bond whatsoever between Father and the Children; thus, there can be no impact upon such bond as a result of the termination of Father's parental rights.

The Children deserve a nurturing, loving, and stable home. The Children presently enjoy a home possessing these characteristics with Mother and Stepfather.  The Children's needs are met and their welfare is being promoted in their present home.  Father's on-going presence in the Children's life would only disturb the peace the Children now enjoy.