471 A.2d 449

**John P. GORDEN and Kathleen Gorden, Appellants,**

**v.**

**Andrew CUTLER and Catherine Day Cutler.**

Superior Court of Pennsylvania.

Argued Sept. 7, 1983.

Filed Dec. 30, 1983.

36

Edward J. Gilson, Philadelphia, for appellants.

Andrew Cutler, Philadelphia, appellee, in propria persona.

Before ROWLEY, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This is an appeal from an Order of the Court of Common Pleas of Philadelphia County (per Judge Samuel H. Rosenberg) "dismiss[ing]" appellants' (John and Kathleen Gorden's) "Petition For Reimbursement of Lying-In Expenses."

We reverse and note at the outset that this is a case of first impression.

The facts are as follows: In November of 1980, appellants retained counsel to assist them in a prospective adoption. Counsel was given the name of a doctor who, upon inquiry, asked him to contact a Miss Day. Counsel did so and was told by Miss Day that she was pregnant, that she was primarily interested in seeing that her child be adopted by Roman Catholics "and also someone to pay the lying-in expenses." (N.T. 4)

Counsel, after securing the necessary information as to cost and the consent of his clients, phoned Miss Day that appellants "would pay the bills." *Id.* This was confirmed in a letter to Miss Day dated January 8, 1981, which estimated the doctor's, hospital's and pediatrician's bill to total approximately $2,850.

The natural father (Andrew Cutler) and mother were informed on numerous occasions by counsel "that if [Miss Day] wanted to change her mind she could do it; but that if [appellants] paid the expenses [they] wanted [Andrew Cutler and Miss Day] to sign a contract to adopt." (N.T. 6–7) In other words, the appellants were willing to pay the medical expenses "on the condition" that the natural parents executed a consent to adopt agreement. After the natural parents acknowledged that they understood the terms (payment of medical expenses and raising the child a Catholic) an adoption agreement was signed "and then [counsel] paid the bill[s.]" (N.T. 7)

After the child was turned over to the appellants, but before the adoption papers could be filed, a Petition For Writ of Habeas Corpus was filed by the natural parents seeking the return of their baby boy. A hearing was held pursuant to the Writ and the less-than-4-month-old infant was returned to the natural parents. However, no provisions were made in regard to the payment of the bills. Thereafter, the Petition under consideration here was filed by the appellants, wherein they alleged:

10. That relying upon the[ ] properly executed Consents by the natural parents, the petitioners herein, John P. Gorden and Kathleen F. Gorden, paid all the medical expenses arising from the birth of Baby Boy Day, and that these expenses then totalled $2,625.00. On May 20, 1981, the intermediary, Edward J. Gilson, Esquire, delivered the child Baby Boy Day to the petitioners herein. That on June 10, 1981, subsequent to the birth of Baby Boy Day an additional bill was received by his natural mother, which was sent to petitioners' attorney and also paid by the petitioners. This was in the amount of $151.84.

11. That pursuant to this agreement, the Petitioners paid the following bills associated with the natural mother's pregnancy, delivery, and care of the child after placement:

| | |
|---|---|
| Frankford Hospital | $1,700.00 |
| Frankford Hospital | 151.84 |
| Charles I. Hoffmeier, M.D. | 925.00 |
| Dr. Malkin, Pediatrician | 64.00 |
| Prescription, child's ear | 5.00 |
| Frankford Hospital, Outpatient blood work | 180.00 |
| | $3,025.00 [sic] |

A copy of these bills is attached hereto, made part hereof, and marked Exhibit "C".

12. ...

13. That six weeks after the birth of Baby Boy Day, the natural parents advised that they had changed their minds and on July 20, 1981, a Petition for Writ of Habeas Corpus on behalf of the natural parents was filed and a Writ of Habeas Corpus issued and was served on petitioners' attorney on September 1, 1981. A Hearing was held on September 17, 1981, and a Decree was issued awarding custody to the natural parents, now known in marriage as Andrew Cutler and Catherine Day Cutler, his wife, per Rosenberg, J.

14. That pursuant to said Decree, the child Baby Boy Day was returned to the custody of his natural parents on September 22, 1981, by the petitioners' attorney.

15. That no provision for reimbursement of the moneys paid by the petitioners was made at the Hearing of the Writ of Habeas Corpus despite the objections of petitioners' counsel and the filing of a Petition for Involuntary Termination which also requested reimbursement as special relief. That counsel requested that these matters be consolidated, but the Court refused.

16. That to date petitioners have expended over $3,000.00, relying upon the Consents and Agreements of Catherine Day Cutler and Andrew Cutler. That although the said Cutlers have changed their minds, they have made no offer to reimburse petitioners' request. Accordingly, petitioners filed this Petition.

WHEREFORE, your petitioners pray this Honorable Court enter a Decree directing Respondents Andrew Cutler and Catherine Day Cutler, his wife, to reimburse petitioners, John P. Gorden and Kathleen F. Gorden, his wife, for the medical expenses of Catherine Day Cutler and Baby Boy Day which were paid by Petitioners.

At the March 3, 1982 hearing to consider appellants' Petition for reimbursement, counsel for appellants testified that the payments of $1,700 and $151.84 were for Miss Day's medication and treatment in the hospital from 5/16/81 to 5/20/81. The obstetrician received $925, which included services for an ultrasound test performed on Miss Day prior to the birth, the delivery, pre-natal care, blood work and circumcision. (N.T. 9) The $64 was paid to a pediatrician during "the term that [the appellants] had custody of the child" and the $5 was for a prescription to treat the child's ear. *Ibid.* As for the $180 received by Frankford Hospital for outpatient blood work, counsel explained it as the cost incurred to operate on the child (circumcision) after he had been given to the appellants—4 days after the birth the natural parents turned their child over to the appellants. (*See* Appellees' "Petition For Writ of Habeas Corpus," Point 4) In particular, counsel for appellants testified:

As to the outpatient work at the Frankford Hospital, the reason for that was that the child was a male and the child had to be circumcised.

And because circumcision is considered an operation, they [appellants] did not want to disturb Miss Day further while she was in the hospital; she would had to have consented to that. They waited until the child was released from the hospital.

The child was subsequently brought back to the hospital. The circumcision was done at that time, and on the doctor's bill is the charge for the circumcision. And their [appellants'] insurance company paid $180 for the hospitalization. (N.T. 10)

Upon inquiry from the court, the natural parents did not dispute any of the evidence testified to by appellants' counsel. Appellant-Gorden then remarked that he had yet to receive any repayment. In response, the natural father stated that he "made an offer to the Gordens or to [Gorden's counsel] through [his] attorney to try and pay back the medical bills, and this was rejected." (N.T. 13) He felt that he had a "moral obligation" to pay back the appellants. However, he just did not have the lump sum amount to "hand over to these people." (N.T. 14) The hearing came to an end after Mr. Gorden disputed the natural father's claim that an arrangement was sought by which the medical expenses would be paid.

Following the hearing, the court entered an Order, accompanied thereafter by an Opinion, denying the appellants' Petition. This appeal followed.

Simply stated, appellants want reimbursement for the lying-in expenses paid by them, in accordance with an adoption agreement breached by the natural parents, for the birth of Baby Boy Day to Catherine Day-Cutler.

The issue posed has yet to be decided in this Commonwealth, as is evidenced by the absence of any case or statutory citation on the part of the lower court or the appellants in support of their respective positions. The natural parents-appellees filed no brief.

In an Opinion filed by the lower court dated May 21, 1981, the judge, in denying appellants' Petition, wrote:

We agree that ... a moral obligation may exist here, and that it would be appropriate for the Cutlers to pay the requested sum to the Gordens. However, the Court lacked authority to order such payments as a matter of law ....

\* \* \* \* \* \*

The necessary corollary to petitioners' present position would be that payment of medical bills, pursuant to this type of contract, would entitle the payors to custody of the child. Such a result could never be countenanced by our courts ... [for] enforcement will be denied where the object of the contract is contrary to public policy. See generally, *Central Dauphin School District vs. American Casualty Co.*, [493 Pa. 254, 257,] 426 A.2d 94, 96 (1981).

\* \* \* \* \* \*

In actuality, it would seem that petitioners were mere volunteers when they made their payment for Mrs. Cutler's expenses. *However, it is unnecessary for us to even reach the issue of whether a contract existed, for the Court is without jurisdiction in the matter. The Family Court does not decide issues sounding in assumpsit. Since we have no doubt that assumpsit could be the only conceivable vehicle for this type of claim, the Petition was properly denied on jurisdictional grounds alone.* (Emphasis added)
(Lower Court Opinion at 2–3)

Our review of the relevant case law undermines not only the result reached by the court below (Order "dismiss[ing]" the cause of action), but we take issue with its jurisdictional determination as *the basis* for its ruling denying appellants' Petition for lying-in expenses.

■ We start by noting that it was proper for the court below to inquire into its ability to hear the claim in controversy, since, " '[A]lthough a court may have no jurisdiction over a particular subject matter, it may have jurisdiction to determine the question of its own jurisdiction ....' " (Cita-

tion omitted) *Commonwealth ex rel. Cook v. Cook*, 303 Pa.Super. 61, 68, 449 A.2d 577, 581 (1982). This may be initiated by the court *sua sponte*, as occurred here. *Cf. Turner v. May Corp.*, 285 Pa.Super. 241, 427 A.2d 203 (1981) (The Court may raise the issue of jurisdiction *sua sponte*, despite the parties' claim to the contrary). *Accord Commonwealth v. Lewis*, 288 Pa.Super. 198, 431 A.2d 357 (1981) (Citing cases). Nonetheless, the lower court's belief that the Family Division—Domestic Relations Branch—of the Court of Common Pleas of Philadelphia County, as compared to the Trial Division, was an inappropriate forum to hear the instant action, and, thus, warranted its *dismissal*, is flawed.

Our Supreme Court, on this exact subject, held in *Commonwealth v. Wadzinski*, 485 Pa. 247, 254–255 & n. 10, 401 A.2d 1129, 1132 & n. 10 (1978):

> [J]urisdictional restraints upon the former common pleas court under the old system no longer exist. The court of common pleas, as reconstituted, possesses the jurisdictions of the former courts of common pleas, courts of quarter sessions, courts of oyer and terminer, orphans' courts, and juvenile courts. One of the purposes of the unified court is, of course, to simplify procedure and remove archaisms from the judicial system. A case may not be dismissed because brought in the wrong court; if the matter is justiciable, there is jurisdiction in the court of common pleas to hear it, and in a multi-division court the remedy for bringing the case in the wrong division is not a dismissal, but a transfer of the matter to the correct division.[10]

> \*    \*    \*    \*    \*    \*

10. Provision for such transfers has now been codified in the Judicial Code, *supra* note 2. Section 952 of the Judicial Code stipulates that "[i]n a court of common pleas having two or more divisions each division of the court is vested with the full jurisdiction of the whole court." Section 5103(c) directs:

"(c) Interdivisional transfers.—If an appeal or other matter is taken to, brought in, or transferred to a division of a court to which such matter is not allocated by law, the court shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper division of the court, where the appeal or other matter shall be treated as if originally filed in the transferee division on the date first filed in a court or magisterial district."

Similarly, the Code provides that appeals filed by mistake in the wrong court shall not be dismissed, but transferred to the proper court. Specifically, Section 5103(a) reads:

"§ 5103. Transfer of erroneously filed matters.

(a) General rule.—If an appeal or other matter is taken to or brought in a court or magisterial district which does not have jurisdiction of the appeal or other matter, the court or district justice shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper court or magisterial district of this Commonwealth, where the appeal or other matter shall be treated as if originally filed in the transferee court or magisterial district on the date first filed in a court or magisterial district."

Instantly, the suit was *dismissed*, and, therefore, appears facially to be at odds with *Wadzinski*. However, because the ruling of the court below is traceable to and is premised upon, in the alternative, notions of public policy, we find it properly before this Court for review. *See Dippel v. Brunozzi*, 365 Pa. 264, 74 A.2d 112 (1950). In other words, notwithstanding the point that the proper selection of a division within the court of common pleas is not a jurisdictional question, and, thus, not immediately appealable,[1] *Binder v. Miller*, 456 Pa. 11, 317 A.2d 304

1. This is premised upon the fact that, procedurally, the normal course of events should cause the documents to be transferred to the correct division of the court of common pleas, instead of being "dismissed" by a judge in the incorrect division in which the cause of action was filed, and the matter would be heard there. *Commonwealth v. Wad-*

(1974), we find persuasive the fact that a hearing on the validity of the agreement to adopt has already been conducted, and the Family Division trial judge has indicated the result he would have reached (denial of relief on a public policy ground) had he felt that the issue was properly before him. Thus, we see no need to vacate the Order entered by the Family Division court and remand for further proceedings before the correct (Trial) Division of the Court of Common Pleas of Philadelphia County. *See Posner v. Sheridan*, 451 Pa. 51, 299 A.2d 309 (1973) (Family Court Division judge entered a decree despite the objection of the losing party that the trust was properly under the jurisdiction of the Orphans' Court Division. On appeal, the Court agreed that the matter should have been filed and dealt with in the Orphans' Court. Nevertheless, the Court reached the propriety of the decree and vacated on grounds other than the divisional jurisdictional error committed by the individual initiating the complaint); [2] *cf. Common-*

zinski, 485 Pa. 247, 401 A.2d 1129 (1978); 42 Pa.C.S.A. § 5103(c). However, we wish to make it clear that we do not countenance the filing of complaints, or courts to docket them, "willy-nilly" without regard to the appropriate division. *See Posner v. Sheridan*, 451 Pa. 51, 299 A.2d 309 (1973). We only want to avoid the harsh result of having a cause of action "dismissed," as was the practice in the past prior to our Commonwealth's creation of a unified judicial system, when the mere transfer of the appropriate documents to the proper division of the court of common pleas can place the case back on the right track.

**2.** It needs to be mentioned that in *Posner*, although Justice Pomeroy agreed with Justice Eagen's lead opinion, which was joined by Jones, C.J., and O'Brien, J., he wrote a concurring opinion. Therein, Justice Pomeroy stated, in effect, that the exercise of its jurisdiction by the court of common pleas through the wrong division of that court would not, by itself, be cause for the Supreme Court to vacate a judgment of the court below. Interestingly enough, this position is consistent with those of the dissent, made up of Roberts, J., and Nix, J., whose opinion was joined by Roberts and Manderino, JJ. We have found no tendency on the part of the Supreme Court to deviate from the position discussed by Pomeroy, J., in *Posner*. *See Binder v. Miller*, 456 Pa. 11, 317 A.2d 304 (1974). Thus, it would be improper for an appellate court to refuse to hear an issue on appeal because it was ruled upon, as to its merits, by a judge from an incorrect division of the court of common pleas. From our examination of the relevant

*wealth v. Wadzinski, supra* (Because the Superior Court did not address the issue, apparently believing that the consideration of the appellant's substantive claim was *ultra vires* the court of common pleas, the Supreme Court remanded the case to the Superior Court for a decision on the constitutional question).

Having just hurdled the question concerning the divisional setup of the courts of common pleas and its effect upon the ability of a judge to hear a complaint filed (erroneously) therein, we are now confronted with an equally intriguing issue that is complicated by the fact that an appellate court of this Commonwealth has not ruled upon the matter, i.e., the recoupment of lying-in expenses paid in consideration of an agreement to adopt that was breached by the natural parents.

Counsel for appellants argues that his clients are entitled to reimbursement for the monies expended on behalf of Miss Day for the birth of her child. He contends further that appellants' entitlement to repayment is premised not on any theory of the law of contract, for "[a] contract to buy or sell children would be void as against the public policy of this Commonwealth[,]" but upon principles founded in equity. (Appellants' Brief at 7–8) This is pure sophistry, for "[t]he authorities uniformly discuss the agreement to adopt as a contract." (Footnote omitted) *In re Adoption of D___*, 122 Utah 525, 534, 252 P.2d 223, 228 (1953). *Accord In re Adoption of F___*, 26 Utah 2d 255, 258, 488 P.2d 130, 132 (1971). Nonetheless, "it is generally recognized that one who is legally competent to adopt another as his child may enter into a valid and binding contract to do so, and according to most, but not all, authorities, if such [a] contract is not performed by the promisor ..., it may be enforced in equity ...." 2 Am.Jur.2d, Adoption, § 13 at 870–871; *see also In re Adoption of F___, supra*, 26 Utah

case law, the Pennsylvania Supreme Court has not yet embraced the nonreviewability of an issue on such a ground.

2d at 260, 488 P.2d at 133. Consistent therewith, "[a]dop-
tion contracts or other agreements in consideration of the
surrender of the custody of a child must, of course, comply
with the provisions of the statute of frauds, although, like
other agreements, they may be taken out of the operation
of the statute by part performance." (Footnote omitted) 59
Am.Jur.2d, Parent and Child, § 37 at 120. Such has oc-
curred in the case at bar.

For instance, it was the natural mother who request-
ed that the prospective adoptive parents, whoever they
might be, be willing to incur "the lying-in expenses." The
appellants accepted the only two terms to the adoption,
payment of medical expenses and raising the child a Catho-
lic, and, at the request of the natural mother, had these
provisions reduced to writing "to confirm the fact that [the
appellants] would pay for the lying-in expenses." This was
done in letter form by counsel for the appellants wherein he
"assured" the natural mother that appellants would "take
care of the [approximately $2,850 in anticipated] bills."

As the negotiations for the proposed adoption progressed,
counsel recalled how he told the natural father "that [his]
clients were willing to pay the medical expenses on condi-
tion that he [the natural father] sign a consent to adoption."
This same condition was communicated on several occasions
to the natural mother.

Finally, as it appears in the record, counsel characterized
the moment at which the custodial exchange occurred in the
hospital dispassionately, as would occur in the culmination
of any business transaction. He stated it as: "They signed.
I paid the bills, and they then turned the baby over to me."
We find the aforesaid to be, in its simple form, descriptive
of a contract, i.e., an offer, acceptance and consideration.
*See* Corbin on Contracts, §§ 2–7 (1952). Now, whether a
breach thereof is recompensable through the courts is an-
other matter. As mentioned earlier, none of the research

engaged in by this Court has uncovered a case from any jurisdiction dealing with this *exact* issue.

Notwithstanding such a formidable task, we have considered the matter as to whether the execution of the consent to adopt in the terms just described violated the public policy of this Commonwealth, as declared by the lower court. If public policy has been violated it should be so declared, and the ruling of the trial judge should be affirmed.

Although "public policy" is a term which eludes easy definition, *Fair v. Negley*, 257 Pa.Super. 50, 390 A.2d 240 (1978), our Supreme Court has spoken on the subject in the vintage case of *Enders v. Enders*, 164 Pa. 266, 271, 30 A. 129, 271 (1894):

> Public policy, in the administration of the law by the courts, is essentially different from what may be public policy in the view of the legislature. With the legislature, it may be, and often is, nothing more than expediency. The public policy which dictates the enactment of a law is determined by the wisdom of the legislature. If the legislature declared by statute, that it was injurious to public interests, under any circumstances, for a parent to surrender the custody of a child during minority to a grandfather, that would be the end of discussion on that question. It has declared, the parent can apprentice his child; can, by certain proceedings in court, permit its adoption by another, and that it can take away, for misconduct, the right of testamentary guardianship. But in the absence of any statute forbidding such a contract as the jury have here found, we must find, as a fact, that such contracts to be void, have a tendency to injure the public, or are against the public good; or, as is said in *Trist v. Child*, 21 Wall. [441] 448 [22 L.Ed. 623], a contract, to be void on this ground, "must be inconsistent with sound policy and good morals as to the consideration or thing to be done." If, by well settled judicial precedent, the law has determined that such a contract as this

tends to the injury of the public, or is inconsistent with sound morality, we would feel bound to follow the law thus declared, without regard to our own notions of the tendency of the contract.

In compliance with *Enders*, we observe, first, that nowhere in the adoption laws of this Commonwealth is an agreement for the payment of pre-natal expenses by the prospective adoptive parents specifically proscribed. In fact, the Adoption Act promulgated in this Commonwealth (23 Pa.C.S.A. § 2101 *et seq.*) makes repeated references in the "Report of intention to adopt" (23 Pa.C.S.A. § 2531(b)(4)), "Report of intermediary" (23 Pa.C.S.A. § 2533(b)(8)) and in the "Contents of petition for adoption" (23 Pa.C.S.A. § 2701(5)) to the documentation and itemization of "moneys and consideration paid or to be paid to or received by the intermediary or to or by any other person or persons to the knowledge of the intermediary by reason of the adoption placement." 23 Pa.C.S.A. § 2533(b)(8). Thus, the exchange of money for the payment of the natural mother's expenses for giving birth are not totally foreign to this Commonwealth. In fact, as is the case in other jurisdictions, "it is a matter of common knowledge that numerous decrees of adoption have been rendered where the person whose consent was required ... [has had their medical expenses paid for by] the adoptive parents either by choice or in compliance with the wishes of petitioners for adoption, viewing the course to be in the best interests of the future well-being of the child." *Barwin v. Reidy*, 62 N.M. 183, 193, 307 P.2d 175, 181–182 (1957). *Accord Gray v. Maxwell*, 206 Neb. 385, 293 N.W.2d 90 (1980); *cf. Matter of Adoption of Kendrick G.*, 114 Misc.2d 483, 486, 451 N.Y.S.2d 963, 965 (1982) ("[T]he Court holds that in private-placement adoptions adoptive parents may reimburse the natural mother for expenses incurred in the care of the adoptive child only after the natural mother has set the adoption wheels in motion by consenting to the adoption of her child;"); *Adoption of Baby Girl Fleming*, 471 Pa. 73, 80, 369 A.2d 1200, 1204 (1977) ("Appellee and

her mother met with the attorney, at which time adoption procedures and financial arrangements for payment of appellee's lying-in expenses were discussed."); *Downs v. Wortman*, 228 Ga. 315, 315, 185 S.E.2d 387, 388 (1971) ("A contract wherein a mother of a child agrees to adoption of her child by another in consideration of a monetary consideration ... [, w]here the monetary consideration is to flow to the child such a contract is not void as against public policy. [Citations omitted]"); *In re Stone's Adoption*, 398 Pa. 190, 195, 156 A.2d 808, 811 (1959) ("The uncontradicted testimony is that neither Mr. or Mrs. Luft were paid for their services as intermediaries and that the only moneys expended by Weismans [the prospective, adoptive parents] was in connection with the payment of medical and hospital bills in the amount of $373.40.").

As for the reference in *Enders* that, absent statutory prohibition, one must look to "well settled judicial precedent" to determine if a contract, such as the one entered into here, is violative of public policy, we are guided by the rulings of our sister states since the only two cases in this jurisdiction (*Enders* and *Commonwealth ex rel. Children's Aid Soc. v. Gard*, 362 Pa. 85, 66 A.2d 300 (1949)) dealing with the matter do so tangentially.

For example, in *Enders* the grandfather agreed to give his daughter-in-law $20,000 and the male child $10,000 when he came of age "if she would permit him to take her son and educate him, she to have the privilege of visiting her child when she desired, and to have him at her home whenever convenient[.]" 164 Pa. at 270, 30 A. 129. The daughter-in-law consented, but the money was never paid. Thereafter, upon the grandfather's death, she sued his estate. In the course of sustaining the daughter-in-law's claim against the estate and holding the contract not to be at odds with public policy, Justice Dean, speaking for the entire Court, held so because, *inter alia*, "this was a family compact" that "was wholly for the welfare of the child." 164 Pa. at 273 & 274, 30 A. 129.

In *Gard,* an agency had contracted with Mr. & Mrs. Gard to provide a foster home for children. The Gards agreed to hold any such child subject at all times to the call of the agency. It was also provided that the Gards should be paid " 'board, clothing, medical care,' etc., for the child." 362 Pa. at 87, 66 A.2d at 302. One such child was placed with the Gards. When it came time to return the child to the agency, at its request, the Gards refused. They argued that the agreement was "against public policy" and that the best interest of the child would be served by her remaining with them.

The lower court judge ordered the child returned to the agency for adoption to some "unknown" prospective parents. On appeal, our Supreme Court affirmed the Superior Court's reversal of the lower court's order. In doing so, it held that the basic error in the agency's contractual "rights" claim was that "the child [was] treated as a chattel without any rights in respect to its own happiness and physical well-being. That a child cannot be made the subject of a contract with the same force and effect as if it were a mere chattel has long been established law." 362 Pa. at 92, 66 A.2d at 304. It went on to say that because the contract "came into being not for the [agency's] benefit but for the child's benefit, ... it w[ould] be given only such legal effect as w[ould] serve the purpose of its creation." 362 Pa. at 96, 66 A.2d at 306.

Since the agency refused to disclose the name of the couple seeking to adopt the child, the Court looked at the length of time the child had spent with the Gards, the bonds of affection developed between them and concluded that "to separate this little girl from Mr. & Mrs. Gard would cause her far more anguish than any" reunion with the agency for purposes of adoption could ever undo.

■ Based on *Enders* and *Gard,* if nothing else can be gleaned therefrom, it can be said that a contractual agreement "benefitting a child" will not *ipso facto* be categorized

as against public policy without first looking at the facts of the particular case. Such an approach is not only laudable, but it is consistent with those courts which have been confronted with the validity of contractual agreements that provide for the payment of pre-natal care in adoption cases. *See* Anno., Right of Natural Parent to Withdraw Valid Consent to Adoption of Child, 74 A.L.R.3d 421, § 18; Anno., What Constitutes Undue Influence in Obtaining a Parents Consent to Adoption of Child, 50 A.L.R.3d 918, § 4.

Our scrutiny of the applicable case law discloses that those jurisdictions which have treated the issue confronting us, either in one form or another, subscribe to a view that was first articulated by the Supreme Court of New Mexico; *viz.*:

It is commonly the case that persons wishing to adopt a child will make provision with its mother, or 'mother and father, before birth of the child, to pay hospital and medical expenses in connection with the care of the mother and child. There is nothing in this practice inimical to public policy. Indeed, it is productive of the welfare of the child that the child and the mother have adequate medical attention which perhaps would not otherwise be provided. If it is permissible to agree to discharge prospective expenses, where is there harm in agreeing that debts already incurred for the same reason and as yet unpaid shall be paid by would-be adoptive parents? Of course the best practice would be for payment to be made directly from them to the creditors— that is, the hospital and doctor. But if payment is made to the natural parents for such purpose under the reasonable belief the money will be used by them to discharge such indebtedness, there is no wrong in law. That is all that happened concerning Sandra Annette, as far as the Barwins knew. There is a stipulation in the record between counsel for the Websters [natural parents] and the first attorney who represented the Barwins [adoptive parents] that the Websters represented to him that San-

dra Annette was born by Caesarean section, although it was not true.

The Websters were advised by that attorney of the consequences attendant upon their execution of consents of this adoption. Other persons, too, talked with them about it. They knew what they were doing—they made their own decisions. It was they who represented a Caesarean section had been performed; it was they who failed to employ the money for the purpose for which they received it. To allow them to come in and vitiate the proceeding as to this child's adoption upon the ground they did not live up to their agreement and obligation would be a legal absurdity.

*Barwin v. Reidy, supra,* 62 N.M. at 196–197, 307 P.2d at 184. This tenet has evolved into an acceptable two-tier approach in assessing the validity of a contractual agreement in the adoption area:

A contract wherein a mother of a child agrees to adoption of her child by another in consideration of a monetary consideration to herself is void as against public policy. See *Savannah Bank and Trust Co. v. Hanley,* 208 Ga. 34, 65 S.E.2d 26. Where the monetary consideration is to flow to the child such a contract is not void as against public policy. See *Savannah Bank and Trust Co. v. Wolff,* 191 Ga. 111, 11 S.E.2d 766.

*Downs v. Wortman, supra,* 228 Ga. at 315, 185 S.E.2d at 388.

The application of this two-tier "benefit" approach analysis is best exemplified by the remarks of Justice Hastings, speaking for the Supreme Court of Nebraska in *Gray v. Maxwell, supra,* 206 Neb. at 392, 393, 293 N.W.2d at 95; to-wit:

We do agree with the contention advanced by the Does [adoptive parents] and adopt the reasoning of *Barwin v. Reidy,* 62 N.M. 183, 307 P.2d 175 (1957), cited by them, that it is not contrary to public policy for persons wishing to adopt a child to make provisions with its mother before

birth to pay hospital and medical expenses in connection with the care of the mother and the child. However, the findings by the trial court were that Mrs. Gray was to receive funds for payment of various expenses which had been paid in full or in part by the Department of Public Welfare and such amounts would therefore constitute the payment of a consideration for the relinquishment.

We have no hesitancy in agreeing with the trial judge that an agreement to pay a mother, in return for the relinquishment of her child, a sum equal to the amount of the hospital and medical expenses which have already been paid by another, constitutes an unwarranted payment of consideration which vitiates the relinquishment. *Barwin v. Reidy, supra.* However, the trial court also found that Mrs. Gray had been promised a separate payment of $1,500 for the same purpose. The testimony of the witnesses both as to the payment of a consideration and as to evidence of coercion and harassment was in hopeless conflict and the trial judge, having observed the witnesses, chose to believe Mrs. Gray to the exclusion of the others. We cannot say that he was arbitrary, unreasonable, or even wrong in so doing. We conclude that the record supports his finding that the relinquishment of the child in this instance was done in consideration of a promise to pay a sum of money in excess of the legitimate expenses of confinement and birth, which is against public policy and vitiates the relinquishment previously given.

*Accord Franklin v. Biggs,* 14 Or.App. 450, 513 P.2d 1216 (1973) (The Court of Appeals of Oregon set aside a decree to adopt which had been consented to in writing by the natural mother. One of the reasons why the court did so was because $200 was given to the natural mother by the adoptive parents for her "to leave the state." This vitiated any consent that may have been given by the natural mother).

We have no hesitancy in embracing and applying the "benefit" approach analysis to the case at bar, for by doing

so we are accomplishing what the Court in *Enders* required that we do, i.e., look to "the probable and natural tendency of such contracts." 164 Pa. at 273, 30 A. 129.

█ As is evident from the facts recounted *supra,* as well as the itemized hospital costs, all of the expenses incurred by the appellants were for medical care that *directly* benefitted the child and in no way inured to the benefit of the natural mother. Also, there is absolutely no evidence to indicate that the appellants paid monies to the natural father and/or natural mother to consent to the proposed adoption so as to vitiate the legitimacy of the contractual agreement, as was the case in *Gray v. Maxwell, supra,* or *Franklin v. Biggs, supra.*[3] Having concluded that the agreement negotiated between the Cutlers and the Gordens is not against the public policy of this Commonwealth, the ruling of the court below being to the contrary is reversed and the court is directed to enter an order consistent with this Opinion in favor of the appellants.

Order reversed and the case is remanded with instructions. Jurisdiction is relinquished.

**3.** If we were to have found that monies changed hands that were not for the "benefit" of the child, but rather induced the natural parents to acquiesce in the proposed adoption, the result would be clearly a violation of public policy and invalidate the contract. And the appellants, in such a situation, would have no recourse in the courts; e.g.:

Where a contract is found to be against public policy "it cannot, under any circumstances, be made the basis of a cause of action. The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them. If they have fully executed their unlawful contract, the law will not disturb them in the possession of what each has acquired under it. If one has executed in whole or in part, the law turns a deaf ear when he pleads for its aid to compel the other to do as much. * * * If the contract is still executory, the promisor is left undisturbed in the possession of the money or other property which he agreed to pay or transfer; if the contract has been executed, the promisee is left undisturbed in the possession of the money or other property which has been paid or conveyed to him." *City of Pittsburg v. Goshorn,* 230 Pa. 212, 227, 79 A. 505, 510; see also *New York & Pennsylvania Co. v. Cunard Coal Co.,* 286 Pa. 72, 81, 82, 132 A. 828, 821; 12 Am.Jur. 725, § 213.

*Dippel v. Brunozzi,* 365 Pa. 264, 267–268, 74 A.2d 112, 114 (1950).