517 A.2d 925

**In re BABY GIRL D., a Minor, Baby Girl E., a Minor, Baby Girl B., a Minor, Baby Boy S., a Minor, Baby Girl S., a Minor, Baby Girl J.M.M., a Minor, Appellants.**

Supreme Court of Pennsylvania.

Argued March 4, 1986.
Decided Nov. 17, 1986.

Elaine V. Preston, Pittsburgh, for appellants.

Robert T. Crothers, Richard J. Amrhein, Peacock, Keller, Yohe, Day & Ecker, Washington, for Family Health Council of Western Pennsylvania, Inc.

William Wycoff, Thorp, Reed & Armstrong, Pittsburgh, for Children's Home of Pittsburgh.

James A. Esler, Asst. County Sol., Pittsburgh, for Children and Youth Services.

Samuel C. Totaro, Jr., Feasterville, for Golden Cradle.

Marianne P. Flood, Philadelphia, for Pennsylvania Committee for Adoption.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

We granted the petition for allowance of appeal of the minor adoptees, through their guardian ad litem, to address the question whether expenses for locating, preparing and arranging an adoption are properly charged to adoptive parents by an adoption agency, Family Infertility and Counseling Center of the Family Planning Counsel of Western Pennsylvania, and, if so, whether any limits on those expenses are properly imposed by the orphans' court division of the court of common pleas. The issue presented raises a question whether persons are profiting impermissibly from the placement of newborn infants in adoptive homes. The various courts of common pleas have taken differing positions as to allowable fees in adoption cases.

The question arose when investigators hired by the court under Orphans' Court Rule 15.5 questioned "unusual" fees charged to adoptors in cases involving the intermediary agency, Family Infertility and Counselling Center of the Family Planning Council of Western Pennsylvania. The questioned fees are for (1) counselling natural mothers; (2) counselling adoptors; (3) advertising expenses; (4) room

and board and travel expenses of the natural mother and certain of the mothers' medical expenses unrelated to the birth; (5) agency fees. The court, *in limine*, ordered the intermediary agency to reimburse adoptors for all amounts paid in connection with these enumerated expenses. Any fees paid by adoptive parents which might operate as consideration for the transfer of a child were disallowed. Superior Court granted the intermediary agency's petition for permission to appeal, but subsequently ruled that because individual findings of fact were not made in each case, the matter should be remanded to the trial court to augment its opinion. Because we deem the record adequate to address the broad legal question involved, we reverse the order of Superior Court, 339 Pa.Super. 624, 488 A.2d 1169, and consider the merits of the claims raised by the parties.[1]

STANDING

Appeal is sought by the infant children, through their guardian ad litem[2], and a question has been raised as to the guardian ad litem's standing to challenge the propriety of the expenses charged to adoptors by the adoption agency. The guardian argues that adoption fees charged to adoptors and paid for the benefit of natural mothers impermissibly affect both the decision of the natural mothers to voluntarily terminate parental rights and the decision of the agency as to which adoptors would provide the best homes for the infant children. The guardian questions whether these infants' placements are based upon financial rewards rather than a detached assessment of the relative merits of prospective adoptors. One judge of the orphans' court division below deemed expenses charged to these adoptive parents tantamount to "huckstering in human infants."

1. Since the date the interlocutory appeal was allowed by Superior Court, adoptions have been decreed in five of the six cases sub judice.

2. The guardian ad litem was appointed pursuant to the authority vested in the orphans' court by virtue of 20 Pa.C.S.A. § 751 which provides, in pertinent part, as follows: "The orphans' court division may appoint ... [o]n its own motion, a guardian or a trustee ad litem to represent the interest, not already represented by a fiduciary, of (i) a person not sui juris...."

■ The guardian ad litem's standing to question the propriety of the fees charged must be grounded upon the standing of the infant children themselves, see *Sigel Appeal,* 372 Pa. 527, 94 A.2d 761 (1953). It should by now be beyond question that it is every American's right not to be bought or sold. PA.CONST. Art. I, § 1 provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Inherent in this provision must be the right of every individual not to be bought or sold. If individuals have the right not to be bought or sold, it necessarily follows that those individuals must have standing to raise that right in appropriate proceedings. Cf., *Stapleton v. Dauphin Co. Child Care Serv.,* 228 Pa.Super. 371, 324 A.2d 562 (1974) (juvenile is a "party" to an action for custody under the Juvenile Act, Act of Dec. 6, 1972, P.L.1464, No. 333, 11 P.S. § 50–101 et seq., since repealed and replaced); Juvenile Act, Act of July 9, 1976, P.L.586, No. 142, 42 Pa.C.S.A. § 6337 (parties to proceedings under Juvenile Act, including children, are entitled to representation by legal counsel). The guardian ad litem was appointed by the court to represent the interests of the children in the proceedings sub judice. Thus, it follows that the guardian ad litem must have standing to challenge any procedure which amounts to a sale of the child whose interests she is appointed to protect.

## REVIEW ON THE MERITS

■ The issue presented is whether the determination below, that impermissible and excessive fees were charged to adoptor parents by the adoption agency, was properly within the discretion of the judge of the orphans' court division. This case presents a pure question of law regarding the authority of the orphans' court division, as protector of the adoption process, to disallow certain fees charged to adoptor parents by the intermediary agency. We will find an abuse of discretion where the lower court's judgment is

manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, *Commonwealth v. Lane,* 492 Pa. 544, 549–550, 424 A.2d 1325, 1328 (1981), or without support in the record.

█ Traditionally, allowable expenses to adoptor parents have been limited to reasonable unreimbursed lying-in expenses, reasonable legal fees incident to the adoption proceedings and costs of the proceeding.[3] The reasons for the limitations on fees are obvious. Firstly, the limitations ensure that children will be placed in homes that promote their needs and welfare, 23 Pa.C.S.A. § 2902. Although financial considerations are certainly a factor, placement of children in adoptive homes should not rest *solely* on the wealth of the adoptors. Many homes with scarce financial resources are nevertheless adequate to provide the love, protection and support that children require. Secondly, the limitation upon expenses ensures that children are not bought and sold like commodities. As noted supra, sales of children contravene the public policy of this Commonwealth, and cannot be sanctioned by our courts. Thus, payments to or for natural parents by adoptor parents are permissible when the payments are for services which directly benefit the child, such as medical expenses directly related to the birth. See, *Gorden v. Cutler,* 324 Pa.Super. 35, 471 A.2d 449 (1983). Such expenses are paid to ensure a safe birth and healthy infant, and not for the benefit of the mother, although the mother certainly receives an indirect benefit. Payments by adoptor parents which do not directly benefit the child are impermissible.

As noted supra, expenses, which were charged to adoptor parents and disallowed by the orphans' court division, include fees for "counselling" natural mothers. The lower court found that counselling for natural mothers was required.[4] Although some natural mothers apparently re-

3. The costs of the proceeding which are properly charged to adoptors are limited by statute to a maximum of $150, 23 Pa.C.S.A. § 2313.

4. The adoptor parents' agreement to pay the costs of counselling natural mothers was surely based upon some assumption that they

fused counselling, most natural mothers were counselled at a cost to the adoptor parents of from $145–$585. In some cases the exact dollar amounts were not available at the hearing, because they had not yet been billed.

■ The intermediary agency argues such charges to adoptor parents ought to be permitted on grounds the counselling benefits the child.[5] The benefit to the child, it is argued, is the stability which will come from the natural mother's settled decision to relinquish parental rights. While we cannot ignore the difficulties endured by children whose homelives are unsettled, we must conclude that any benefits from counselling natural mothers inure to the direct benefit of the natural mother and not to the child. The child is benefitted, if at all, only indirectly. Thus, payment by adoptive parents for counselling natural mothers in preparation for relinquishment of parental rights falls outside the guideline that permissible payments directly benefit the child. Moreover, one is left to wonder whether the same adoption agency can objectively counsel both the natural mothers and prospective adoptors, as will be discussed infra, where the counselling fees seem to be connected to the adoption process. For these reasons, we cannot say that the orphans' court division abused its discretion in disallowing such charges to adoptive parents.

Some adoptor parents were also charged for expenses of transporting natural mothers to Pittsburgh and of housing the natural mothers for periods of up to ten and one-half weeks prior to the birth. Room and board were charged in two of the cases sub judice. In both cases, the natural mother's home was outside the Pittsburgh area. Again, the intermediary agency argues that room and board were medically necessary; however, the record does not support this claim.

would obtain a baby after the counselling. Nowhere in the record is it suggested that adoptor parents paid a natural mother's counselling expenses out of any charitable motive.

**5.** It should be noted that all the children involved in these proceedings are newborn infants.

■ Room and board were charged at the rate of $50 per week. Although the exact amounts of charges to adoptors for these expenses are not included in the record in each case, it is interesting to note that in no case did the adoptor couple house the mother of the infant they were to adopt. Of course, were adoptor couples to house the natural mother whose child the adoptors awaited at the adoptors' expense, such could arguably constitute a payment to the mother in anticipation of the transfer of the child in contravention of the criminal statute proscribing dealing in infants, 18 Pa.C.S.A. § 4305. Moreover, such an arrangement would raise questions about the voluntariness of the natural mother's decision to relinquish parental rights. Therefore, adoptor couples housed natural mothers of infants who were to be placed with different adoptor couples. The costs of housing a natural mother were, however, borne by the adoptor couple who would later obtain that mother's infant. The lower court's recognition of this attempted subterfuge and order that adoptor parents be reimbursed by the agency for payments made on account of natural mothers' housing expenses is a proper exercise of that court's discretion.

■ Other expenses paid by adoptors for services to the mother include medical expenses wholly unrelated to the birth [6], Lamaze classes, pre-natal care and sonograms. These expenses were all disallowed. Again, these expenses are not directly connected with the birth, and, thus, are outside the parameters of the traditional allowable expenses in adoption.

Modern medical science is making great strides toward determining ideal developmental conditions for a fetus in utero. With the relatively recent understanding of nutrition, appreciation for the value of vitamins in the daily diet, and studies of the effects of cigarette smoking and alcohol

6. One mother had a mass surgically removed from her breast, and the cost of the medical procedure was billed to the adoptive parents. The rationale for this was that the mass might be malignant and, if so, metastasize, threatening the fetus.

consumption, for instance, modern notions of ideal pre-natal care for infants are expanding. Are we then to sanction provision by adoptive parents of a halcyon environment and delectable foods for expectant mothers on the grounds these are beneficial to the child? If medical science were to determine that stress during pregnancy was inimical to the fetus, and an expectant mother's employment was causing her stress, would prospective adoptors be expected to employ an agency to find the mother a happier work environment, or perhaps simply support the mother during her pregnancy lest the added stress inhibit the baby's development or effect his insufferable disposition? We think not. Services such as these, which directly benefit the natural mother, would naturally tend to influence the mother's decision whether to relinquish her parental rights. This we cannot allow. The fact that the child may enjoy an indirect benefit from these services cannot provide a basis for permitting their provision for the mother at the expense of prospective adoptors.

Most adoptors participated in infertility counselling and adoption counselling in a two-step process. First came infertility counselling. If, at the conclusion of the infertility counselling, the infertile couple desired to adopt, adoption counselling followed. Adoption counselling consisted of advice regarding advertising availability to adopt newborn children and warnings about a "black market" in adoptions. Although some of the adoptors testified that this counselling was a regular part of the adoption service, other adoptors testified that counselling was optional. The court resolved this conflict in favor of a finding that counselling was required. One adoptive parent testified that the costs of adoption counselling were only billed to persons who adopted. Thus, the so-called counselling expenses are clearly an agency fee for an adoption, and not a fee for counselling as such. Costs for counselling adoptor parents range from $50–$75 per case.

The intermediary agency argues the fees for counselling prospective adoptors are proper because Department of

Public Welfare regulations for licensed adoption agencies mandate the availability of counselling.[7] However, ensuring the *availability* of counselling to those who seek it does not mean *compelling* adoptive parents to avail themselves of that counselling.[8] Certainly, where potential adoptors voluntarily seek counselling services, they should pay fair value for those services. In the present case it appears that mandatory counselling generated fees to the agency. Such practice is not envisioned by DPW's regulations.

█ Finally, the court disallowed advertising expenses and ordered the intermediary agency to reimburse adoptors for advertising costs in connection with newspaper ads and leaflets. Advertising for adoption has not been barred by the General Assembly and is certainly a legitimate means, in this society, of making one's availability to adopt publicly known. The form of the ads in the instant case does not appear of record. Thus, we cannot determine whether the ads simply announced the availability of adoptors, or whether they promoted the agency itself as the guardian's brief suggests. Thus, the record does not support the lower court's determination that advertising fees were improperly charged to adoptor parents by the intermediary agency, and, on this record, this determination must be reversed.

We are all aware that because of the availability of effective contraceptives, the legalization of early pregnancy termination and the custom of many young women to delay parenting in order to establish careers, the number of white infants available for adoption is dwindling while the demand for them is increasing. The same young women who have delayed parenting to establish their careers, and who have difficulty conceiving, also have relatively high incomes.

---

7. The Department of Public Welfare, Office of Children, Youth, Families Social Services Manual provides at ¶ 2–1–16 that "The service provider shall insure, either directly or through referral, the availability of counseling and other services, as needed, to natural parents, the child and the adoptive parents."

8. Among the adoptors in these cases, only one couple testified they did not receive *adoption* counselling, although they did receive fertility counselling. The husband is a psychiatrist and the wife a clinical psychologist.

Instantly, the adoptive parents have substantial annual incomes, ranging upward from $34,000. The danger thus presented is that white infants will be placed with the family who can pay the most money.

█ The brief of Family Infertility and Counselling Center recites its sliding scale fee arrangement. Under this arrangement, the agency's fee is calculated at seven and one-half percent of the adoptor couple's gross annual income, with a ceiling of $7500.[9] What relation the costs of providing an adoption service could possibly bear to the adoptors' gross annual income escapes definition. What seems clear from such a sliding scale, however, is that agencies will naturally be motivated to place babies with the adoptors who can afford to pay the highest fee, and not necessarily with the family that can provide the most loving and supportive home. The charging of a fee based upon the income of the adoptor parents is per se illegal. It is the function of the orphans' court division of the courts of common pleas to guard that adoptions do not provide a profit, for, when they do, someone is surely "dealing in humanity" in contravention of the criminal statute. We are satisfied that the court has properly discharged this function in the instant case by disallowing such. Indeed, any agency fee which is unrelated to those set forth in this opinion must be disallowed.

The order of Superior Court is reversed, and the record is remanded to the orphans' court division for entry of an appropriate, final order.

HUTCHINSON, J., files a dissenting opinion which is joined by ZAPPALA and PAPADAKOS, JJ.

HUTCHINSON, Justice, dissenting.

I respectfully dissent. I agree with the majority that all fees paid by adoptors must promote the child's welfare. For this reason, the majority may well be correct in holding

---

**9.** Contrast this with the usual adoption agency fee in Allegheny County which is $150–$200.

that a sliding scale of fees should be proscribed. A schedule of fees based solely on the adoptors' income does not establish any correlation with the actual services flowing to the child. Therefore, absent legislative or appropriate administrative approval of such a fee, judicial proscription is proper.

Nevertheless, for the following reasons, I believe Superior Court properly remanded these cases to the Orphans' Court Division of the Court of Common Pleas (Orphans' Court) to make specific factual findings in each case. First, I believe there is insufficient evidence in the record to support the general conclusions of the Orphans' Court in these cases. Second, while I agree with the majority that all fees paid by the adoptors must promote the child's welfare, I disagree with the majority's *per se* rule requiring a direct benefit to the child. I believe the distinction between direct and indirect will at best prove elusive and will probably lead to anomalous results. So-called indirect benefits under certain circumstances promote the needs and welfare of the child and may at times be essential to its well-being.

## I

I share the majority's concern that helpless infants not be bartered or sold like commodities in our society, but I find these records to be equivocal.

The Adoption Act, 23 Pa.C.S. §§ 2101–2910, enacted October 15, 1980 and effective January 1, 1981, mandates that the Orphans' Court appoint counsel to represent the child in a contested involuntary termination proceeding and authorizes the appointment of counsel or a guardian *ad litem* at any time for a child who has not reached the age of 18 years. 23 Pa.C.S. § 2313(a).[1] Prior to the filing of a

1. This Section of the Adoption Act was amended by the Act of June 23, 1982, P.L.617, to read as follows:

(a) General rule.—The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who

Petition for Adoption, 23 Pa.C.S. §§ 2701 and 2702, the Act requires two reports: a report of intention to adopt, 23 Pa.C.S. § 2531 and 2532, to be filed by the person intending to adopt a child within thirty days after receiving custody of the child, and a report of the intermediary, §§ 2533 and 2534, to be filed by the intermediary who arranged the adoption within six months after the report of intention. Both of these reports require itemized accounting of moneys and consideration paid or to be paid to the intermediary, 23 Pa.C.S. § 2531(b)(4), or to any other person by reason of the adoption placement, 23 Pa.C.S. § 2533(b)(8). Section 2535 then requires the Orphans' Court to cause an investigation to be made covering all pertinent information regarding the child's eligibility for adoption and the suitability of the placement. 23 Pa.C.S. § 2535. Thus, the Orphans' Court has full authority to investigate the entire placement process and the expenditures involved.

In these six adoption cases, each presented by the same attorney and involving the same unlicensed intermediary employed by an unlicensed agency,[2] the Orphans' Court appears, not wholly without foundation, to have had concerns as to the propriety of the expenses paid by the adopting parents. The individual opinions of the Orphans' Court articulate that Court's serious concerns about misleading practices and statements on the part of the adoptors and the intermediary, slip op. *In re: Adoption of Baby Girl D*, Allegheny County Court of Common Pleas, Orphans' Court Division, No. 282 of 1982, at 2–4. At the request of counsel following one of the hearings on voluntary relinquishment in November, 1982, the Orphans' Court filed an order *in limine* setting forth guidelines for allowable

has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

2. Family Health Council of Western Pennsylvania, Inc., t/d/b/a Family Infertility and Adoption Center and Family Planning Council of Western Pennsylvania received a license from the Department of Welfare on January 13, 1983. Reproduced Record at 231–233a.

charges to be paid by the adoptors in all six of these cases prior to the court's issuance of final orders of adoption. These guidelines prohibit the intermediary agency from imposing on adoptors charges for the natural mother's room and board or travel expenses, charges for counseling and non-birth-related medical expenses. *Id.* at 8–12.[3]

The majority justifies on two grounds the Orphans' Court's holding that *any* expenses paid by the adoptors that do not directly benefit the child must be proscribed. The first assumes that if the adoptors are allowed to pay for any other expenses, intermediaries, such as Family Planning,[4] will place children with the wealthiest couples seeking adoption without considering other factors which affect that couple's fitness as parents as compared to others seeking children for adoption.[5] Out of concern that wealth may become the only consideration, the majority reasons that the needs and welfare of children in general, not the particular children here involved, will be promoted, pursuant to 23 Pa.C.S. § 2902, by *not* placing them in homes on the basis of proposed adoptors' means. From these premis-

**3.** While the Orphans' Court also prohibited fees paid for advertising, the majority concluded that the evidence in the record was not sufficient to conclude that advertising fees were improperly charged to adoptors. Maj. op. 459.

**4.** It appears from the record that all parties, as well as the Orphans' Court, assumed that the nominal intermediary, Elizabeth Cessna, acted as an agent of Family Planning within the scope of her authority. *Id.* at 2. Therefore, we will hereinafter treat Family Planning as the actual intermediary.

**5.** It should be noted that the 1982 amendments to the Adoption Act permit the court to charge the costs attendant to an adoption proceeding to the county.

(b) Payment of costs.—The court, in its discretion, may order all or part of the costs attendant to a proceeding under this part to be paid by the county wherein the case is heard, the adopting parents or apportioned to both, provided that if the adopting parents shall be ordered to bear all or a portion of the costs of this part that:

(1) the court may direct that the payment of the fees or a portion thereof may be paid by a court ordered schedule of payments extending beyond the date of the involuntary termination hearing; and

(2) the fee shall not exceed $150.

23 Pa.C.S. § 2313(b).

es, it concludes that all charges for costs not directly related to the birth and adoption itself should be precluded in all cases. Even if we accept the premise and its resultant policy as sound, the court's authority to propound general rules is limited to matters of procedure. Const. of PA. art. V. § 10(c). In matters of substance, the court's authority extends only to case by case adjudication.

The majority further justifies its action by assuming that any service provided by the adoptors to the natural mother will unduly and *improperly* influence her in her decision on whether to relinquish her parental rights. From this premise the majority concludes that the buying and selling of children can be prevented by not allowing the adoptors who will receive the child to finance any of the expenses other than reasonable, unreimbursed lying-in expenses, counsel fees for the adoption proceeding and the costs of the proceedings. Maj. op. at 454–455.

In these six cases the fees paid by the adopting parents that have been prohibited by the Orphans' Court and affirmed by the majority include fees for counseling both the natural mother[6] and the adopting couple, expenses for room and board for the natural mother, and all medical expenses not directly related to the delivery of the child.

Facts to support the assumptions the majority makes are difficult to gather within the context of this judicial record, which contains conflicting testimony combined from sepa-

---

**6.** The Adoption Act as amended in 1982 clearly supports the concept of counseling for natural parents but does not mandate it:

(a) List of counselors.—Any hospital or other facility providing maternity care shall provide a list of available counselors and counseling services compiled pursuant to subsection (b) to maternity patients who are known to be considering relinquishment or termination of parental rights pursuant to this part.

(b) Compilation of list.—The court shall compile a list of qualified counselors and counseling services (including adoption agencies) which are available to counsel natural parents who are contemplating relinquishment or termination of parental rights pursuant to this part. Such list shall be made available upon request to any agency, intermediary, hospital or other facility providing maternity care.

23 Pa.C.S. § 2505.

rate cases. The record lacks evidence to support an identical result in all six cases on all proscribed items. Because of the equivocal nature of the record, the majority's analysis appears to be based more on disputable theories than proven facts and would be more appropriately left to a legislative or administrative body. Judicial action, on the other hand, requires an analysis of each proscribed item of reported expense on the basis of the evidence produced in connection with each child. To accomplish this task, I believe it is apparent that Superior Court correctly remanded these records to the Orphans' Court for a case by case determination and to supplement the record as may be necessary.

## II

From the language of the majority's opinion, I fear its *per se* rule that all fees paid by the adopting couple must directly benefit the child will preclude consideration of the unique circumstances that develop with each adoption. Under the text of its opinion, if the natural mother were afflicted with a life threatening illness that could also kill the child she carries, the adoptors could not come to her aid because the natural mother would directly benefit from the treatment. Maj. op. at 456–457 n. 5. This would be the case even if all of the evidence clearly indicated that she intended to relinquish her parental rights to that particular adopting couple. It is difficult to understand how the needs and welfare of the child are promoted under such circumstances. On the other hand, if the adoptors were financing the natural mother's face lift, there would be no benefit to the child, and there would be a legitimate concern that financing this operation was a form of consideration for the baby.

It is for this reason that courts have traditionally examined the propriety of fees for adoptions on a case by case basis. As our Superior Court noted in a recent examination of the propriety of certain fees in adoption proceedings:

A contract wherein a mother of a child agrees to adoption of her child by another in consideration of a monetary consideration to herself is void as against public policy. *See Savannah Bank and Trust Co. v. Hanley,* 208 Ga. 34, 65 S.E.2d 26 [1951]. Where the monetary consideration is to flow to the child such a contract is not void as against public policy. *See Savannah Bank and Trust Co. v. Wolff,* 191 Ga. 111, 11 S.E.2d 766.

*Gorden v. Cutler,* 324 Pa.Superior Ct. 35, 53, 471 A.2d 449, 458 (1983) (quoting *Downs v. Wortman,* 228 Ga. 315, 315, 185 S.E.2d 387, 388 (1971)). The Superior Court further noted that while there is little Pennsylvania precedent on point, what can be derived from those cases is:

> that a contractual agreement 'benefitting a child' will not *ipso facto* be categorized as against public policy *without first looking at the facts of the particular case.* Such an approach is not only laudable, but it is consistent with those courts which have been confronted with the validity of contractual agreements that provide for the payment of pre-natal care in adoption cases. *See* Anno., Right of Natural Parent to Withdraw Valid Consent to Adoption of Child, 74 A.L.R.3d 421, § 18; Anno., What Constitutes Undue Influence in Obtaining a Parents [sic] Consent to Adoption of Child, 50 A.L.R.3d 918, § 4.

*Gorden v. Cutler, Id.,* 324 Pa.Superior Ct. at 51–52, 471 A.2d 457 (emphasis added).

In *Enders v. Enders,* 164 Pa. 266, 30 A. 129 (1894), a grandfather offered his daughter-in-law $20,000, and her son $10,000 when he reached maturity, "if she would permit him to take her son and educate him, the boy to make his home with him until he was of age, she to have the privilege of visiting her child when she desired, and to have him at her home whenever convenient." *Id.,* 164 Pa. at 270, 30 A. at 129. This Court reasoned that if the agreement had been between strangers, and the natural parent was trying to relieve herself of all maternal obligations, then the agree-

ment would have been against public policy. *Id.*, 164 Pa. at 272-73, 30 A. at 130. This Court held, however, that because this was a "family compact" and intended to promote the welfare of the child, it was not against public policy. *Id.*, 164 Pa. at 273-74, 30 A. 130. Although distinguishable, this case does clearly illustrate that a fee paid by the adopting parents may be solely for the purpose of inducing the natural mother to consent to the adoption in one case, or for the welfare of both. *See also Barwin v. Reidy*, 62 N.M. 183, 307 P.2d 175 (1957) (the court must look to the circumstances of a particular case to determine whether to revoke an adoption because of fees paid to the natural parents).

Pennsylvania's Adoption Act, to my mind, requires a case by case analysis by the Orphans' Courts. In recent amendments, the legislature has not proscribed any particular fees. Instead, it has left the matter to the Orphans' Courts to decide only whether they were excessive in the context of particular cases. Section 2533(c) of the Adoption Act, which was added in 1982, provides:

> Appropriate relief.—The court may provide appropriate relief where it finds that the moneys or consideration reported or reportable pursuant to subsection (b)(8) are excessive.

23 Pa.C.S. § 2533(c). As noted *supra* at page 3, the Adoption Act requires the adopting parties to provide a report of their payments to the intermediary, 23 Pa.C.S. § 2531, and the intermediary to provide:

> An itemized accounting of moneys and consideration paid or to be paid to or received by the intermediary or to or by any other person or persons to the knowledge of the intermediary by reason of the adoption placement.

23 Pa.C.S. § 2533(b)(8). Therefore, under the Adoption Act, the Orphans' Court can and should determine whether any particular fee is excessive. The Act does not seem to me to authorize the Orphans' Court to rule in or out whole servic-

es or charges in order to determine excessiveness. Rather, it must look at the circumstances involved in each particular proceeding. *See, e.g., In re Adoption of Baby Boy L.*, 27 Pa.D. & C.3d 584 (1983) (in applying the Act the Orphans' Court reduced a $5,000 attorney fee, where the facts indicated the adoption proceeding was routine).

### III

The economic realities of shrinking government aid for social services cannot be ignored. And, as appellant admits, it is becoming more difficult for conventional adoption agencies to meet their financial needs through donations.[7] If the only way that an adoption agency can provide services that promote the needs and welfare of the child is to charge the adopting parents, it should be permitted as long as there is no real evidence that it is encouraging the buying or selling of babies.

Because of these problems, I, like Superior Court, would vacate the Orphans' Court's order and remand all six cases to that Court with instructions to hold further hearings consistent with this opinion. In this way the Orphans' Court could determine whether the fees paid by the adopting parents promoted the child's welfare under the circumstances. Under this standard some fees, such as lying-in expenses, would clearly benefit the child, while others, such as the sliding scale fee, would provide no benefit to the child at all. This analysis, however, would provide more flexibility to the Orphans' Court to look at all the circumstances when dealing with fees for less conclusive services such as room and board.

ZAPPALA and PAPADAKOS, JJ., join this opinion.

7. It should be noted that Children's Home of Pittsburgh supports the position of Family Planning. Children's Home of Pittsburgh has been in existence for over forty years, but as appellant admits, it is having difficulty financing adoptions through traditional methods. Appellants' Reply Brief, at 5–6.